LEWIS G. HUTCHENS NON-MARITAL TRUST, UNITED MISSOURI BANK OF KANSAS CITY, N.A., SUCCESSOR TRUSTEE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hutchens v. Commissioner
Docket Nos. 1453-89, 1454-89, 1455-89, 12081-90, 12275-90
United States Tax Court
T.C. Memo 1993-600; 1993 Tax Ct. Memo LEXIS 613; 66 T.C.M. (CCH) 1599; December 16, 1993, Filed *613 For petitioners: Charles W. German, Randall E. Hendricks, and Paul L. McLaughlin. For respondent: Frank M. Schuler and Michael L. Boman. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following tax deficiencies and additions to tax in the notices of deficiency that are at issue in the five cases consolidated herein: Docket No. 1453-89:
Type
Period Petitioner of Tax
Ending Deficiency Addition to Tax
Lewis G. Hutchens
Income
3/31/86
$ 2,278,421
--  Non-Marital Trust
Docket No. 1454-89:
Type
Additions to Tax
Petitioner of Tax
Period Deficiency Sec. 6651
Estate of
Gift
1982
$ 8,957,627
$ 2,239,407
Lewis G. Hutchens
Harriett K. Hutchens
Gift
1982
487,506
121,877
By amended answer filed in the above case, respondent asserts that the gift tax deficiency of the Estate of Lewis G. Hutchens is $ 7,094,435, and that the addition to tax under section 6651 owed by the Estate is $ 1,773,609, rather than the above amounts determined in the notice of deficiency.
Docket No. 1455-89:
Type
Date of
Petitioner of Tax
Death
Deficiency Addition to Tax
Estate of
Estate
3/01/85
$ 15,424,031
--  Lewis G. Hutchens
*614 By amended answer filed in the above case, respondent asserts that the estate tax deficiency is $ 22,427,538, rather than the above amount determined in the notice of deficiency.
Docket No. 12081-90:
Type
Additions to Tax
Petitioner of Tax
Period Deficiency Sec. 6651
Estate of
Gift
1983
$ 1,457,815
$ 364,454
Lewis G. Hutchens
1984
1,166,236
291,559
1985
288,538
72,135
Respondent's answer in the above case asserts that the gift tax deficiency for 1984 is $ 1,365,163, rather than the above amount determined in the notice of deficiency.
Docket No. 12275-90:
Type
Addition to Tax
Petitioner of Tax
Period Deficiency Sec. 6651
Harriett K. Hutchens
Gift
1985
$ 3,840,370
$ 960,093
Respondent's answer in the above case asserts that the gift tax deficiency is $ 5,443,445, and that the addition to tax under section 6651 is $ 1,382,110, rather than the above amounts determined in the notice of deficiency.
After concessions, we are called upon to decide the following issues: (1) Whether the common stock surrendered by Mr. Lewis G. Hutchens, decedent, and his wife in a recapitalization of their family-owned *615 corporation was worth more than the preferred stock that they received, resulting in taxable gifts to their children who owned the remaining stock; (2) whether decedent and his wife made taxable gifts to their children by reason of the fact that their family-owned corporation failed to pay dividends on the preferred stock that the couple received in the recapitalization; (3) whether the date of death value of the 83-percent interest that decedent had held in his family-owned corporation before the recapitalization is includable in his gross estate under section 2036; (4) whether the date of death value of the preferred stock that decedent had held in his family-owned corporation was $ 14,942,930, that is, $ 3,491,927 more than the amount reported on his estate tax return; (5) whether the amount paid by the family-owned corporation to a non-marital trust and to Mrs. Hutchens in redemption of decedent's and Mrs. Hutchens' preferred stock in the corporation several months after the date of decedent's death was less than the fair market value of the stock with the result that Mrs. Hutchens made a taxable gift to her son Jeffrey, the sole remaining shareholder of the corporation; (6) whether *616 the amount paid by the corporation in redemption of its preferred stock several months after the date of decedent's death was more than the basis of the stock in the hands of the non-marital trust to which decedent's preferred stock was transferred under his will with the result that the trust realized a long-term capital gain; (7) whether considerations of symmetry require the imposition of tax at some stage during the transactions at issue; (8) whether decedent's estate overstated the marital deduction to which it is entitled for estate tax purposes; and (9) whether petitioners are liable for additions to tax under section 6651 for failure to file gift tax returns reflecting the gifts determined by respondent. All section references are to the Internal Revenue Code, unless otherwise stated. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. The Stipulation of Facts filed by the parties and the attached exhibits are incorporated herein by this reference. Mr. Lewis G. Hutchens, referred to herein as decedent, died unexpectedly on March 1, 1985, due to "acute cardiac failure". He was 58 years of age and was a resident of the State of Missouri *617 at the time of his death. He was survived by his wife, Mrs. Harriett K. Hutchens, and their four sons, Mr. Jeffrey C. Hutchens, (Jeffrey), Mr. C. Ted Hutchens II (Ted), Mr. Lewis G. Hutchens, Jr. (Gene), and Mr. Todd H. Hutchens (Todd). Decedent's will was admitted to probate in Greene County, Missouri, and letters testamentary were issued appointing decedent's eldest son, Jeffrey, as personal representative of the estate. At the time that the petitions in the cases at docket Nos. 1454-89, 1455-89, and 12081-90 were filed, Jeffrey's legal residence was Springfield, Missouri. At the time the petitions in the cases at docket Nos. 1454-89 and 12275-90 were filed, decedent's widow, Mrs. Hutchens, also resided in Springfield, Missouri. Decedent's will first directs his executor to pay decedent's debts and expenses and the expenses of administering decedent's estate. In the will, decedent then bequeaths to his wife any real property used by him as a residence and certain personal property. Through the will, decedent gives to his sons the amount that takes maximum advantage of the unified credit for Federal estate tax purposes. Decedent's will then directs that the rest, residue, *618 and remainder of his property be placed in a Non-Marital Trust and instructs the trustees to pay the income of the trust to decedent's wife during her life. The will further provides that upon the later of the death of decedent's wife or November 4, 1990, the trust shall terminate, and the property shall be distributed to or for the benefit of decedent's sons Gene and Ted. The will invests the trustees with discretion whether to distribute any trust assets for the benefit of decedent's youngest son, Todd. November 4, 1990, is Jeffrey's 40th birthday. Decedent's will provides that the trustees of the Non-Marital Trust are to be Jeffrey, Gene, Ted, and three of decedent's business associates who are not members of the family. It provides that Gene and Ted are to share one vote. Mrs. Hutchens is not named as a trustee. At the time the petition in the case at docket No. 1453-89 was filed, the principal place of business of the Non-Marital Trust was Springfield, Missouri. The principal asset owned by decedent when he died was stock of Hutchens Industries, Inc. The predecessor of that corporation, Springfield Auto Works, was incorporated in 1926 under the laws of the State of Missouri. *619 One of the founders of the corporation, Mr. C. Ted Hutchens, was decedent's father. Eventually, decedent's father gained control of the corporation, and, in 1946, Springfield Auto Works changed its name to Hutchens Metal Products, Inc. In 1973, the corporation adopted its present name of Hutchens Industries, Inc. (herein referred to as HII). Originally, HII engaged in auto body repair and tank manufacturing. During the Second World War, it manufactured tank trailers and mortar tanks for the Government. In 1950, the company began to concentrate on manufacturing truck suspension systems, and in 1957, the company began providing suspensions to Fruehauf, Inc., the largest truck trailer manufacturer in the country. It provided suspensions to Fruehauf through 1962, when Fruehauf began to manufacture its own suspensions. HII continued to sell its suspensions to other manufacturers. HII presently makes 70 percent of all domestic truck trailer suspensions, with the exception of those manufactured by Fruehauf for its own use. In 1966, Mr. C. Ted Hutchens transferred control of HII to his son, decedent. By 1977, decedent and his immediate family owned all the outstanding stock of *620 HII. The truck suspension market is very competitive. HII's business is cyclical, with peaks and valleys occurring in its business cycle approximately every 5 years. In 1982, the business was at a low point in its cycle. For many years, including those at issue here, the HII board of directors retained substantial amounts of cash in the corporation. These cash reserves provided working capital and supported the company during low points in its business cycle. From 1960 through 1985, the company paid dividends in only 3 years: It paid $ 225,904 during its 1972 fiscal year, $ 233,972 during fiscal year 1973, and $ 242,040 during fiscal year 1974. HII paid decedent, its president, a base salary plus bonuses tied to the company's performance. The following table reflects the compensation that HII paid to decedent during the calendar years 1975 through 1985: Year
Base Salary Bonus Total 1975
$  60,000.00
--    $  60,000.00
1976
62,250.00
$  56,939.00
119,189.00
1977
64,575.00
209,853.96
274,428.96
1978
85,833.38
271,537.00
357,370.38
1979
100,000.00
422,794.08
522,794.08
1980
100,000.00
359,167.00
459,167.00
1981
125,000.00
176,619.00
301,619.00
1982
125,000.00
125,544.92
250,544.92
1983
132,500.00
93,579.00
226,079.00
1984
140,000.04
802,180.35
942,180.39
1985
25,000.00
--    25,000.00
*621 Jeffrey began working for HII in 1972. In 1978, he became vice president of administration and took charge of the daily office activities. In 1981, he became executive vice president and presided over the daily operations of the entire company. All other vice presidents reported to him. Jeffrey held that office until his father's death in 1985, when he succeeded his father as president. Gene and Ted each have held relatively minor jobs with HII. At the time of trial neither was still employed by HII. By 1982, Todd, the youngest brother, was estranged from his father and was uninvolved in the family business. During the years in issue, decedent, his wife, and Jeffrey comprised HII's board of directors. After decedent's death, the shareholders did not fill his place on the board. Sometime before 1981, Jeffrey suggested to decedent that he investigate using an estate planning device known as an "estate freeze". After discussing the matter with Mr. Gary Lipscomb, HII's accountant, decedent caused HII to explore the merits of a recapitalization to effectuate an estate freeze. For this purpose, HII retained the Centerre Trust Co. of St. Louis, Missouri (herein referred to as *622 Centerre), to appraise HII's equity value and the value of the stock held by decedent and his wife. Mr. Rodger C. Krasnicki of that firm was responsible for the project. HII also retained as legal counsel the St. Louis law firm of Bryan, Cave, McPheeters & McRoberts (herein referred to as Bryan, Cave). Centerre and Bryan, Cave together formulated a plan to recapitalize the stock of HII. Under the plan, decedent and his wife would receive preferred stock, and three of their sons would receive common stock. Each share of preferred stock would be eligible to receive high adjustable-rate dividends and a preference upon liquidation of the corporation. The purpose of the dividend rights and liquidation preference was to enhance the value of the preferred stock and, thus, to assure that the value of preferred stock was at least equal to the value of the common stock to be surrendered. On November 13, 1981, HII's shareholders and directors met and authorized execution of the "Plan and Agreement of Recapitalization", which had been formulated by Centerre and the Bryan, Cave law firm. The shareholders and directors also approved the filing of amended and restated articles of incorporation, *623 and they approved execution of a "Stock Restriction and Purchase Agreement", described below. According to the minutes of the combined meeting of shareholders and directors, the purpose of the transaction "was to freeze the value of [decedent's] stock at its present value for estate planning purposes and to provide for an orderly transition of voting control to the remaining shareholders upon the happening of specified events, including [decedent's] death." Consummation of the recapitalization was contingent upon receipt by the company of a favorable ruling by the Internal Revenue Service or of a favorable opinion from the Bryan, Cave law firm. On November 13, 1981, HII requested a private letter ruling from Internal Revenue Service regarding the income tax consequences of the proposed recapitalization. On March 8, 1982, Mr. Krasnicki of Centerre completed his appraisal of the value of HII. Mr. Krasnicki determined that the value of the corporation as of August 31, 1981, was $ 20 million. He valued each share of voting and nonvoting common stock held by decedent and his wife before the recapitalization at $ 1,400.28. On this basis, Mr. Krasnicki concluded that decedent's interest *624 in the corporation before the recapitalization, consisting of 8,653.5 shares of voting common stock and 3,835 shares of nonvoting common stock, was worth $ 17,487,396.78. Mr. Krasnicki also determined that the Class A and B preferred stock to be received by decedent and his wife in exchange for their old stock would be worth $ 107.14 per share. On this basis, decedent's interest in the corporation after the recapitalization, consisting of 142,216 shares of Class A voting preferred stock and 21,000 shares of Class B voting preferred stock, would be worth $ 17,486,962.24. Centerre and the Bryan, Cave law firm modified the recapitalization plan slightly to take into account the final appraisal of HII by Mr. Krasnicki and decedent's intervening donation of 179 shares of HII nonvoting common stock to charities. The modifications were considered and approved at a combined meeting of shareholders and directors held on May 3, 1982. Pursuant thereto, the shareholders executed the "Amended and Restated Plan and Agreement" on May 3, 1982. On August 4, 1982, the Internal Revenue Service issued a private letter ruling on the proposed recapitalization. Among other things, the Service ruled *625 that the exchange of stock contemplated under the Amended and Restated Plan and Agreement would be a recapitalization within the meaning of section 368(a)(1)(E) and that HII would be "a party to a reorganization" within the meaning of section 368(b). The Service further ruled that no gain or loss would be recognized by HII upon the receipt of the corporation's old stock in exchange for the new stock to be issued in the recapitalization, that none of the shareholders would recognize gain or loss upon the exchange, and that their bases and holding periods in the old stock would carry over to the new stock received in the exchange. The ruling also stated as follows: The above rulings are effective to the extent that the fair market value of the stock received by each exchanging shareholder is approximately equal to the fair market value of the stock surrendered in exchange therefor. No opinion is expressed about the tax treatment of the amount by which the fair market value of the stock received exceeds, or is less than, the fair market value of the stock surrendered. A determination of the respective fair market values of the stock is specifically reserved until the Federal income *626 tax returns of the taxpayers involved have been filed for the taxable year in which the proposed transaction is consummated.
The actual exchange of securities pursuant to the amended plan took place on September 27, 1982. Immediately before the recapitalization, the outstanding stock of HII was owned by decedent and members of his family as follows: Voting Nonvoting
Common Common Name
Stock
Percent
Stock
Percent
Lewis G. Hutchens
8,653.5
86.79
3,656  75.42
Harriett K. Hutchens
550  5.52
669.5
13.82
Jeffrey C. Hutchens
499  5.01
254  5.24
Lewis G. Hutchens, Jr.
134  1.34
134  2.76
C. Ted Hutchens, II
134  1.34
134  2.76
9,970.5
100.00
4,847.5
100.00
Under the Amended and Restated Articles of Incorporation that were filed on September 27, 1982, pursuant to the recapitalization (herein referred to as Amended Articles), HII was authorized to issue the following five classes of stock: Number of
Stock Shares Authorized
Par Value
Class A preferred
180,000
$ .10
Class B preferred
30,000
.10
Limited preference
150,000
.01
Voting common
80,000
.05
Convertible non-
voting common
70,000
.05
Immediately *627 after the recapitalization, the outstanding capital stock of HII was owned as follows: Preferred Stock Class A
Percent
Class B
Percent
Lewis G. Hutchens
140,684
89.78
21,000
100
Harriett K. Hutchens
16,018
10.22
--  --
156,702
100.00
21,000
100
Convertible
Common Stock
Voting
Percent
Nonvoting
Percent
Jeffrey C. Hutchens
9,629
100
-- --
C. Ted Hutchens II
-- --
3,427
50
Lewis G. Hutchens, Jr.
-- --
3,427
50
9,629
100
6,854
100
As set forth above, decedent owned 8,653.5 shares of voting common and 3,656 shares of nonvoting common stock or 83.071 percent of the 14,818 shares of HII outstanding before the recapitalization. In the recapitalization, he exchanged those shares for 140,684 shares of Class A preferred stock, 89.78 percent of the total shares of that class that were issued, and 21,000 shares of Class B preferred stock, all of the shares of that class. Mrs. Hutchens exchanged her 550 voting common shares and 669.5 nonvoting common shares for the remaining 16,018 Class A preferred shares. It is evident from the above chart that decedent and his wife received all of the new Class A and B preferred *628 stock, Jeffrey received all of the voting common stock and two of decedent's other sons, Ted and Gene, received all of the convertible nonvoting common stock. The convertible nonvoting common stock could be converted into limited preference stock. However, because neither Ted nor Gene exercised his right to convert his stock, no limited preference stock was ever issued. Each share of Class A preferred stock issued in the recapitalization was entitled to one vote and was eligible to receive a noncumulative dividend, if declared by the board of directors, equal to the " prime based preferred stock dividend amount". The Amended Articles define that amount to be $ 100 multiplied by the sum of the prime rate of interest published by the First National Bank in St. Louis plus 2 percentage points, provided that the sum would not be greater than 18 percent nor less than 10 percent. Thus, if the bank's prime rate were 12 percent on the first date of the fiscal year in which the dividend was declared, the dividend would be $ 14 per share. The dividends on the Class A preferred stock were to become cumulative to the extent of $ 3 per share per year beginning on the later of November 4, 1985, *629 or the date of decedent's death. The voting rights of the Class A preferred stock were to lapse on the later of the date of decedent's death or November 4, 1990, Jeffrey's 40th birthday. However, the Amended Articles provide that beginning on the later of those two dates: In the event that the Corporation shall at any time be in arrears in the payment of cumulative dividends in the aggregate of $ 3.00 upon any share of Class A Preferred Stock or Class B Preferred Stock, the holders of the Class A Preferred Stock shall be entitled * * * to one vote per share for the purpose only of declaring dividends out of the earnings of the Corporation, voting together with Class B Preferred Stock as a single class, without the participation of Voting Common Stock or any other class of stock of the Corporation in such vote, and to so vote and declare no more than $ .75 per share per quarter to be applied against unpaid, accrued cumulative dividends.
Dividends were payable to holders of the Class A and B preferred stock before any dividends could be paid to holders of the common stock. Decedent intended that the cumulative dividends would provide a secure source of income for his widow. *630 Class A preferred stock also had a liquidation preference. This preference ensured that the net proceeds from the liquidation of HII would be payable first to Class A preferred stockholders in the amount of $ 100 per share plus any declared but unpaid dividends. The board had the option to pay dividends on the Class A preferred stock at such time during the fiscal year as it might choose. Additionally, at the earlier of the death of decedent or his wife, HII had the right, but not the obligation, to redeem some or all of the outstanding Class A preferred stock, from any holder thereof, at a price of $ 105 per share plus any declared but unpaid dividends. Class B preferred stock was entitled to the same rights as Class A, except that a holder of Class B stock had the right to convert that stock into shares of convertible nonvoting common stock, which is described below. This right was to last for a period of 15 years and 9 months after decedent's death. Decedent intended to keep the Class A preferred shares for himself, thus retaining control of the company for his lifetime. The dividends would be available to provide him with income after he stopped working. The Class A and *631 Class B preferred stock would go into trust when decedent died, and the trustees would have discretion to convert the Class B stock into convertible nonvoting common stock. Each share of voting common stock was entitled to one vote. After the voting rights of the Class A and B preferred stock lapsed, the voting common stock would be the only class of stock entitled to vote. The voting common stock was entitled to dividends and to liquidation proceeds after the payment of such dividends and proceeds to the holders of the Class A and B preferred stock. Because Jeffrey received all the voting common stock in the recapitalization, he would control HII after his father's death and after his own 40th birthday. There was no agreement that, in the intervening period, decedent would control the manner in which Jeffrey voted his shares. Each share of convertible nonvoting common stock had the same dividend and liquidation rights as voting common stock, but it had no vote in corporate affairs. The purpose of the convertible nonvoting common stock was to enable Ted and Gene, and possibly Todd, to share in the growth of the company. Each share could also be converted into a fixed income *632 security in the form of a share of the Limited Preference stock. Limited preference stock held dividend and liquidation rights similar to those of Class A and B preferred stock, but its holder was not entitled to vote on general corporate matters. As mentioned above, before the recapitalization, HII and its shareholders, other than decedent, entered into a Stock Restriction and Purchase Agreement. This agreement was designed to enable the Hutchens family to retain control of HII. It provides that the signatories to the agreement would not sell, assign, mortgage, or pledge in any manner their HII stock without the prior written consent of HII, unless they first offered the stock to HII at a price determined with reference to HII's book value or other bona fide price. The agreement further provides that, notwithstanding its other provisions, the shareholders could transfer their stock to their spouses, their lineal descendants, or into trust. During its fiscal year ending May 31, 1982, HII was in the trough of its business cycle. Its income had been decreasing since 1979. In early 1981, in an effort to diversify from the cyclical truck suspension industry, HII had begun developing *633 a secondary line of business, called "Hutchline". The Hutchline venture involved the manufacture and sale of portable coal handling and sizing equipment. By the end of 1982, however, it was becoming apparent that the weight of the equipment was too light to be commercially feasible. In addition, at some point prior to May 1983, one Hutchline customer brought a product liability suit against HII. To provide security to the corporation during this difficult period, the board maintained a high level of corporate assets in cash. As of September 27, 1982, HII held approximately $ 5.25 million in cash. Also, as of that date, HII conservatively estimated that its net earnings through June 1, 1983 would reach at least $ 1.23 million. In 1983, HII's business was relatively flat, and earnings stayed roughly the same. The corporation was still assessing the potential cost of the Hutchline failure. Another threat to HII's financial stability was a product design failure for an indexing rail on van sliders. In addition to potential liability to customers, HII faced inroads from competitors furnishing alternative equipment. However, HII expected new business to arise when the Federal *634 Government released regulations pursuant to the Surface Transportation Act. That legislation, when implemented by administrative regulations, would permit the use of larger truck trailers. Such change could mean substantial new business for HII, manufacturing suspensions for the larger trailers. However, HII did not feel the impact of those regulations in its fiscal year 1983. The new regulations finally led to a boom in business in the 1984 fiscal year. HII ended the year with approximately $ 5 million in net profits, up from approximately $ 1 million in fiscal year 1983. Decedent remained cautious, however, and urged HII's directors that, "As a result of the business upturn during the fiscal year, it was, and would continue to be, necessary for the company to maintain a large working capital reserve for the purpose of financing receivables and inventory." The fiscal year ending in May 1985 was a record year, with net profits of $ 8 million. In March 1985, HII estimated that the Hutchline product liability suit would settle at a cost of $ 200,000 to $ 300,000. HII had also remedied the van slider failure at a lower cost than originally estimated. Between September 27, 1982, *635 the date of the recapitalization of HII, and March 1, 1985, the date of his death, decedent contributed the following number of shares of Class A preferred stock to various charitable organizations: 12/17/82
840 shares
11/21/83
1,050 shares
11/13/84
2,500 shares
Total
4,390 shares
Decedent valued these charitable contributions at $ 100 per share and reported the gifts on his joint Federal income tax returns for 1982, 1983, and 1984. On the date of his death, decedent owned 136,294 shares of HII Class A preferred stock and 21,000 shares of HII Class B preferred stock. Decedent's estate retained Centerre to appraise the value of decedent's preferred stock for purposes of filing his Federal estate tax return. Centerre conveyed its findings to the estate in a valuation report dated July 17, 1985. Centerre, through the efforts of its employee, Mr. Bryan Goetz, valued decedent's preferred stock by comparing it to preferred stock of other corporations that exhibited similar risk characteristics. In making its valuation, Centerre noted a drop in HII's market share due to competition from other manufacturers. In a supplemental opinion issued in 1990, Centerre further advised *636 that variable-rate preferred stock issues had dropped in value and popularity between 1982 and 1985. Centerre also stated that the prime rate, and thus the dividend rate payable on HII's Class A and B preferred stock, had deceased substantially. This decline had a pronounced downward impact on the value of the stock. Centerre concluded that as of the date of death, the per-share value of decedent's preferred stock had dropped to $ 72.80. Based upon the Centerre appraisal, decedent's Federal estate tax return reported the fair market value of decedent's Class A preferred stock to be $ 9,922,203.20 (i.e., 136,294 x $ 72.80) and the value of decedent's Class B preferred stock to be $ 1,528,800 (i.e., 21,000 x $ 72.80), for a total of $ 11,451,003.20. Under the terms of his will, decedent's preferred stock in HII was distributed to the Non-Marital Trust. For estate tax purposes, Jeffrey, acting in his capacity as personal representative of decedent's estate, elected to treat all of the property distributed to the Non-Marital Trust as "qualified terminable interest property" (QTIP) within the meaning of section 2056(b)(7). A few months after decedent's death, Jeffrey and the other *637 trustees of the Non-Marital Trust began to consider HII's acquisition of the stock held by the trust. Such a redemption would give Jeffrey voting control of the company, and it would enable the trustees to diversify the trust's holdings so that the beneficiaries' fortunes would not be dependent upon the continued success of HII. Jeffrey and the other trustees also considered HII's acquisition of the shares held by Ted and Gene. Negotiations for the acquisition of the shares were difficult. A rift had developed between Jeffrey and his brothers, and between Jeffrey and at least one of the other trustees, regarding the management of HII. During the negotiations, all of the beneficiaries of the trust were represented by counsel. HII provided all parties and their representatives with all pertinent data, including the latest Centerre appraisal. On December 9, 1985, HII's directors and shareholders approved HII's redemption of its Class A and B preferred stock and its convertible nonvoting common stock on the basis of the parties' agreements resulting from the negotiations. On December 12, 1985, HII purchased from the Non-Marital Trust the 136,294 shares of Class A preferred stock *638 and the 21,000 shares of Class B preferred stock that decedent had owned at the time of his death. HII paid $ 72.80 per share, or a total of $ 11,451,003.20 in cash. Mrs. Hutchens and Ted, as beneficiaries of the trust, signed specific consents to the sale. Todd, who had a contingent interest in the trust, also signed a specific consent to the sale. On the same day, the company redeemed Mrs. Hutchens' 16,018 shares of Class A preferred stock at the price of $ 72.80 per share, or a total of $ 1,166,110.40 in cash. HII also redeemed Ted's nonvoting common stock for $ 2,180,000. Gene had sold his shares to HII sometime earlier. On the same date, Jeffrey resigned as a trustee of the Non-Marital Trust. Decedent had established the L.G. Hutchens Insurance Trust on or about December 11, 1964. According to the trust indenture, the original corpus of the trust consisted of two life insurance policies upon decedent's life with an aggregate face value of $ 35,000. The trust indenture provides: At any and all times when there is any net income from the Trust and Trust Estate, I direct that as long as my wife, HARRIETT K. HUTCHENS, be alive, the net income be paid to her in quarterly *639 or other convenient installments at least annually for as long as the Trust continues.
The trust indenture grants broad authority to the trustees in managing the trust. Among other powers, the indenture provides that: [My trustees] may buy corporate stock and securities of all kinds, whether or not they are of the kind of assets [that] trust funds are usually invested in or otherwise * * *. * * * My Trustees are particularly authorized to buy assets from my estate upon and after my death, and are authorized to loan money, with or without security, to my executors or personal representatives or the trustees of any trust created under the terms of my Will. They may hold any property so purchased from my estate, whether or not same is creating or producing income, and without being responsible for any loss on account of retaining same as assets or as a part of this Trust and Trust Estate.
For estate tax purposes, Jeffrey, acting in his capacity as personal representative of decedent's estate, elected to treat all of the property distributed to the L. G. Hutchens Insurance Trust as "qualified terminable interest property" (QTIP) within the meaning of section 2056(b)(7). *640 OPINION The principal issues in this case involve the estate and gift tax consequences of the use of an estate planning device popularly referred to as an "estate freeze". See generally Federal Transfer Tax Consequences of Estate Freezes, Joint Committee on Taxation, April 24, 1990 (referred to herein as Joint Committee Analysis). As its name implies, the objective of this planning device is to "freeze" the value of property held by a member of an older generation at its current value and to pass any future appreciation in the property to a younger generation. Typically, the older person retains control over the property during his life and also retains some or all of the income derived from the property. A variety of techniques have been used to "freeze" the value of property in an estate, including corporate recapitalizations, grantor retained income trusts, joint purchases, buy-sell agreements, and self-canceling installment notes. See Joint Committee Analysis at 9-16. During consideration of the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, 101 Stat. 1330 (referred to hereafter as OBRA 1987), Congress expressed concern that estate freeze devices enabled taxpayers *641 to transfer appreciation in assets between generations free from gift or estate taxes. H. Rept. 100-391 (II), at 1041-1044 (1987). The report issued by the House of Representatives on the bill that became OBRA 1987 describes and evaluates as follows the type of estate freeze used by decedent in this case: One way to freeze an estate is to recapitalize a closely-held corporation to have both voting preferred and common stock outstanding. The par value of the preferred stock is set at the current value of the corporation. The owners give the common stock to their heirs and retain the preferred stock themselves. The owners claim that since the par value of the preferred stock equals the value of the corporation, the common stock has little value and, consequently, little or no gift tax is owed. At the owners' death, only the preferred stock, which did not participate in the appreciation in corporate assets, is includible in the estate. Thus, the recapitalization and gift permits appreciation in the value of corporate assets to pass between generations without being subject to gift or estate taxes, even though the voting and dividend rights of the preferred stock give the owners *642 beneficial enjoyment of the entire corporation. Likewise, owners of a partnership may freeze their estate by restructuring the partnership to have one class of interests, one with preferred management, income, or liquidation rights, and the other with greater rights in the appreciation of partnership assets, and giving the latter to their heirs. The committee believes that keeping a preferred stock interest in an enterprise while giving away the common stock resembles a retained life estate, and should be treated as such. [Id. at 1043.]
The remedy selected by Congress to address this concern was former section 2036(c), an estate tax provision, which, in effect, treated the transfer as an incomplete gift and included the property in decedent's gross estate at the time of his death. More specifically, former section 2036(c) addressed the situation where a person held a substantial interest in an enterprise and made an inter vivos transfer of property having a disproportionately large share of the potential appreciation in such person's interest in the enterprise. If the individual retained a disproportionately large share in the income of, or rights in, the enterprise, *643 then such retention was treated as a retention of the enjoyment of the transferred property. Former section 2036(c)(1). See generally H. Conf. Rept. 100-495 (1987), 1987-3 C.B. 274-275. Dispositions of either the retained property by the transferor or of the originally transferred property by the original transferee prior to the transferor's death resulted in a deemed gift equal to the amount that would have been includable in the gross estate had the original transfer been made at the time of the death of the transferor. Former sec. 2036(c)(4). Former section 2036(c) applied to property transferred after December 17, 1987. OBRA 1987, sec. 10402(b), 101 Stat. 1330-432. The provision was amended in 1988 by the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 3031(a)(1), 102 Stat. 3634. Soon after former section 2036(c) was enacted, it became apparent that the provision was too broad in application and too uncertain in operation. These and other problems led to the retroactive repeal of section 2036(c) in 1990 by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11601(a), 104 Stat. 1388-490 (hereafter referred *644 to as OBRA 1990). Congress replaced section 2036(c) with the special valuation rules set forth in Chapter 14 of the Internal Revenue Code, sections 2701 through 2704. OBRA 1990, sec. 11602(a), 104 Stat. 1388-491. The rules employ a gift tax scheme, under which the initial transfer is valued using a set of gift tax valuation rules that take into account the likelihood that related parties will exercise rights in an arm's-length manner. In general, the new rules became effective in the case of transfers after October 8, 1990. OBRA 1990, sec. 11602(e), 104 Stat. 1388-500. This case involves an estate freeze that took place during the latter part of 1982, well before the legislative changes described above. Decedent and his wife, the older generation, received voting preferred stock in the recapitalization of HII, and their sons, the younger generation, received common stock. Respondent's position is that the recapitalization constitutes an attempt to circumvent gift and estate taxes on the transfer of the future appreciation in the value of HII, and respondent has mounted a multifaceted attack upon the transaction. There are seven main elements to respondent's attack. First, *645 respondent takes the position that decedent and his wife made taxable gifts to their sons by means of the recapitalization. Respondent argues that the fair market value of the preferred stock that decedent and his wife received was substantially less than the value of the common stock that they gave up. The amounts of the gifts determined in the notice of deficiency at issue in the case at docket No. 1454-89 and the amounts alleged by respondent during these proceedings have varied as follows: Gift by Decedent
Notice Amended Answer
Trial
Value of stock given up
$ 14,998,654 $ 17,000,000 $ 17,000,000 in the recapitalization
Less:
Value of stock received
(17,769)
(8,084,200)
(12,126,300)
in the recapitalization
Amount of the gift
14,980,885 8,915,800 4,873,700 Gift by Mrs. Hutchens Value of stock given up
1,485,914 1,260,000 in the recapitalization
Less:
Value of stock received
(1,846)
1,260,000 in the recapitalization
Amount of the gift
1,484,068 - 0 -   We refer to the above as the recapitalization gift issue. Second, respondent contends that, after the recapitalization, decedent and his wife made taxable gifts to their *646 sons by reason of HII's failure to pay the noncumulative dividends for which the preferred stock was eligible. The gifts determined and alleged by respondent during these proceedings have varied as shown by the following schedule: Decedent
Decedent
Decedent
No. 12081-90
No. 1454-89
No. 1455-89
Gift Tax-
Gift Tax-
Estate Tax-
Year
Notice
Amended Answer
Amended Answer
1982
--  $ 3,198,636
$ 3,198,636
1983
$ 2,556,193.00
--  2,197,650
1984
2,401,339.44
--  2,513,024
1985
570,977.22
--  --  5,528,509.66
3,198,636
7,909,310
Mrs. Hutchens
Mrs. Hutchens
No. 12275-90
No. 12275-90
Gift Tax-
Gift Tax-
Year
Notice
Answer
1982
--  --  1983
--  --  1984
--  --  1985
$ 1,668,995.60
$ 4,592,768
1,668,995.60
4,592,768
We refer to the above as the foregone dividend issue. Third, respondent argues that the subject recapitalization was a transfer described in section 2036 under which decedent retained the possession or enjoyment of, or the right to the income from, his 83-percent interest in HII for his life, or for a period not ascertainable without reference to his death, or for a period that did not in fact end before his death. *647 Thus, in computing decedent's estate tax, respondent takes the position that decedent's gross estate must include the fair market value of his original 83-percent interest in HII, valued as of the date of death. Respondent has taken various alternative positions concerning the amount to be included in decedent's gross estate on account of this adjustment. They are summarized as follows: Notice -- No. 1455-89:
FMV of 83% of
HII on 3/1/85
$ 38,381,234 Less:
Value of stock received
in recapitalization
(17,769)
38,363,465 Amended Answer in
No. 1455-89, par. 7.b.8:
FMV of 83% of
HII on 3/1/85
33,200,000 Less:
Value of stock received
in recapitalization
(8,084,200)
25,115,800 Amended Answer in
No. 1455-89, par. 7.b.9:
23,535,252 Value of stock
received by:
Jeffrey
$ 13,748,768
Lewis
4,893,242
Ted
4,893,242
23,535,252
Amended Answer in
No. 1455-89, par. 7.c.:
21,748,997 At trial:
33,080,000 We refer to this as the retained life estate issue. Fourth, respondent takes the position that decedent's estate tax return understates the value of decedent's preferred stock in HII. According to respondent, the value of *648 decedent's preferred stock in HII on the date of his death was $ 14,942,930 (i.e., 157,294 shares x $ 95), or $ 3,491,927 more than the amount reported. We note that in the notice of deficiency at issue in the case at docket No. 1455-89, respondent stated that the value of decedent's preferred stock in HII on the date of death was $ 14,675, or $ 11,436,328 less than the amount reported. Fifth, respondent asserts that Mrs. Hutchens made a taxable gift in December 1985 when HII redeemed the 16,018 outstanding shares of Class A preferred stock owned by Mrs. Hutchens and the 157,294 shares of Class A and B preferred stock owned by the Non-Marital Trust. According to respondent, the amount of the gift is equal to $ 32.20 per share, the difference between respondent's asserted fair market value of the preferred stock at the time of the redemption, $ 105 per share, and the amount paid by the corporation, $ 72.80 per share. Thus, in the notice at issue in the case at docket No. 12275-90, respondent determined that Mrs. Hutchens made a total gift during 1985 in the amount of $ 5,580,646 (i.e., $ 32.20 x 173,312 shares). On brief, respondent contends, in the alternative, that the fair market *649 value of the preferred stock at the time of the redemption was $ 95 per share, rather than $ 105, and, accordingly, Mrs. Hutchens made a gift of $ 3,847,526.40 ($ 95 less $ 72.80 times 173,312 shares). We refer to this as the redemption gift issue. Sixth, respondent argues that the Non-Marital Trust realized a capital gain when the corporation redeemed the preferred stock held by the trust. In the notice of deficiency at issue in the case at docket No. 1453-89, respondent determined that the date of death value of decedent's preferred stock and, hence, the carryover basis of the stock in the hands of the Non-Marital Trust, was $ 14,675. As a result, respondent determined that on December 12, 1985, when the corporation redeemed the stock held by the Non-Marital Trust for $ 11,451,003.20 (i.e., $ 72.80 per share), the trust realized a capital gain in the amount of $ 11,436,328.20. On brief, respondent contends that the date of death value of decedent's preferred stock was $ 95 per share. Seventh, respondent determined in the notice of deficiency at issue in the case at docket No. 1455-89 that decedent's estate overstated the marital deduction by $ 15,839,878.83. There are two *650 components to this adjustment. First, respondent determined that the interest of decedent's spouse in the L.G. Hutchens Insurance Trust was a "terminable interest". Accordingly, respondent decreased the marital deduction by the amount of the insurance proceeds paid to the trust, $ 100,000. Second, respondent decreased the marital deduction by an additional $ 15,739,878.83. This is principally a consequence of other adjustments described above, which would increase the nonprobate assets in the estate by the date of death value of decedent's 83 percent of HII, $ 38,363,465, treated as a transfer under section 2036, and which would increase the expenses, debts, and taxes by the increased Federal and State death taxes. Before beginning our analysis of the issues enumerated, we must dispense with two preliminary matters. First, during the trial of this case, petitioners attempted to introduce into evidence three documents on which the Court reserved ruling. These documents are: (1) The Government's original valuation report concerning the HII stock as of the date of the recapitalization and as of decedent's date of death; (2) a submission made by the Estate of Lewis G. Hutchens *651 to the Government in response to that report; and (3) the estate tax examination report. Contrary to the Court's direction, petitioners did not address the admissibility of these documents in their post-trial briefs. Accordingly, we hold the documents to be inadmissible. As a second preliminary matter, we note petitioners' contention that the burden of proof with respect to the valuation issues in these cases should be borne by respondent. Petitioners point out that respondent abandoned the expert valuation on which the notices of deficiency were based and now relies upon the valuation of another expert. Petitioners also allege that the notice of deficiency at issue in the case at docket No. 1455-89 "was issued arbitrarily by IRS District Counsel with no investigation or examination on the asserted deficiencies, on the last day before the statute of limitations would otherwise have run". Based thereon, petitioners argue, the presumption of correctness that normally attaches to respondent's determinations has vanished, and respondent should bear the burden of proof on the valuation issues and on the matters at issue in the case at docket No. 1455-89. We disagree. We have rejected *652 similar arguments in the past. See Estate of Smith v. Commissioner, 57 T.C. 650, 656 (1972), affd. 510 F.2d 479 (2d Cir. 1975); Gatlin v. Commissioner, T.C. Memo. 1982-489, affd. 754 F.2d 921 (11th Cir. 1985). "As a general rule, this Court will not look behind a deficiency notice to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedure involved in making * * * [her] determinations." Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974). (Citations omitted.) Petitioners have advanced nothing that makes us believe that this is one of the rare cases in which we should deviate from that rule. Our explanation in Estate of Smith v. Commissioner, supra at 656, disposes of petitioners' argument here: Petitioner next contends that the process by which respondent arrived at the valuation determined in his deficiency notice was "without foundation, unreasonable and arbitrary." This argument we also reject as without merit. Even if we *653 were to decide that respondent's determination was erroneous, neither that consequence, nor the fact that respondent has reduced his claimed valuation from that set forth in the deficiency notice, constitutes sufficient grounds for disregarding the deficiency notice or relieving petitioner of its burden of proof. Jacob D. Farber, 43 T.C. 407, 428-429 (1965). Nothing in this record permits the conclusion that respondent's action was so utterly unjustified as to fall within the ambit of Helvering v. Taylor, 293 U.S. 507 (1935). Moreover, it is well established that -- at least where unconstitutional conduct is not involved -- the courts will not inquire into the administrative policies and procedures employed by respondent prior to making his determination. Arthur Figueiredo, 54 T.C. 1508 (1970).
Before leaving the question of burden of proof, we note, notwithstanding our rejection of petitioner's argument, that there are several matters at issue in the five cases consolidated herein on which respondent bears the burden of proof. For example, respondent concedes that she bears the burden *654 of proof with respect to the fourth issue enumerated at the beginning of this opinion, whether the date of death value of decedent's preferred stock in HII is $ 14,942,930. In formulating our opinion in this case, we have imposed the burden of proof on respondent where appropriate. Issue 1. The Recapitalization-Gift Issue
The first issue for decision is whether decedent exchanged his common stock for preferred stock of lesser value in the 1982 recapitalization. If he did, he may have made a taxable gift to the corporation and, ultimately, to the other shareholders, all of whom were members of his family. Sec. 2512(b); sec. 25.2512-8, Gift Tax Regs. Petitioner bears the burden of disproving respondent's valuations. Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 2511(a) provides that the gift tax applies to all transfers, whether direct or indirect. Section 2512(b) provides that, when property is transferred for less than adequate and full consideration, the amount by which the value of the property exceeds the value of the consideration shall be deemed a gift. "The value of the property is the price at which such property would change hands between *655 a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts." Sec. 25.2512-1, Gift Tax Regs.; McShain v. Commissioner, 71 T.C. 998, 1004 (1979). Donative intent on the part of the transferor is not required for imposition of gift taxes. Sec. 25.2511-1(g), Gift Tax Regs. The valuation of corporate stock is a question of fact, and the Court must weigh the evidence and draw appropriate inferences. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Tele-Communications, Inc. v. Commissioner, 95 T.C. 495, 516 (1990). In the absence of an open market for the subject stock, it is proper to consider all the facts and circumstances related to the corporation in determining its fair market value. O'Malley v. Ames, 197 F.2d 256, 257-258 (8th Cir. 1952). There is no formula universally applicable in determining such value. HII based its 1982 recapitalization on the values determined by Mr. Krasnicki in the Centerre report. *656 Centerre determined that the value of the stock decedent was to transfer in the recapitalization was approximately equal to the value of the stock that he was to receive. According to Centerre's appraisal, the common stock that decedent gave up in the recapitalization was worth $ 17,487,396.78 (i.e., 12,488.5 shares x $ 1,400.28), and the Class A and B preferred stock that he received in exchange was worth $ 17,486,962.24 (i.e., 163,216 shares x $ 107.14). A. Mr. May's Valuation
At trial, petitioners based their contention that decedent transferred and received stock of equal value upon the testimony and report of Mr. Richard C. May, president of Valumetrics, Inc. Mr. May first determined the total equity value of HII as of September 27, 1982, the date of the recapitalization. He next allocated that value among the shares of HII stock held before the recapitalization, and then to the shares held after the recapitalization. Mr. May used four methods to determine the equity value of HII as of September 27, 1982. The method he chose primarily to rely upon was a capitalization of earnings method, using an unleveraged capitalization factor (herein referred to as the Unleveraged *657 Capital Factor method). Under this method, Mr. May arrived at the value of HII's equity by comparing HII to equivalent companies. To do this, Mr. May first computed HII's inflation-adjusted after-tax earnings. Mr. May then calculated the ratio of the current price to earnings for four of the five comparable companies that he had identified, to arrive at an average ratio of 10.24 (the "capitalization factor"). Mr. May multiplied HII's adjusted earnings by this capitalization factor and made other adjustments to account for the value of HII's capital debt and for its interest expense and related tax deductions. He added a control premium, derived by comparing control premiums of other companies' stock, and applied a marketability discount. This discount reflects the idea that it is less attractive to buy into a closely held business than to purchase shares of a business traded on an open exchange. He then added the value of HII's nonoperating assets. He ultimately determined the company's value to be $ 17,820,000. Mr. May's computation of the value of HII is as follows: CAPITALIZED EARNINGS VALUE CALCULATION
Estimated pretax earnings
$ 2,453,812 Estimated income taxes of 46.3%
(1,136,115)
Inflation adjusted after tax earnings
1,317,697 Unleveraged capitalization factor
x 10.24 Adjusted capitalized operating earnings
13,493,217 Less market value of capital debt
(2,083,619)
Plus present value of tax shields
+ 406,358 Value of company's operations on
marketable minority interest basis
11,815,956 Control premium of 37.5%
+ 4,430,984 Value of company's operations on
marketable control basis
16,246,940 Marketability discount of 10.0%
(1,624,694)
Value of company's operations on
nonmarketable control basis
14,622,246 Value of nonoperating assets
+3,200,000 Value of the company on
nonmarketable control basis
17,822,246 Rounded
17,820,000 *658 To test the results determined under the Unleveraged Capital Factor method, Mr. May compared the valuation obtained thereunder with valuations derived under three other methods. His first alternate method was the Capital Asset Pricing Model method (herein referred to as the CAPM method). The CAPM method measures the business and financial risk of a company, and it provides a factor for valuing the company based on its performance relative to that of other similar businesses. The CAPM method is another capitalization of earnings approach, but one that takes the debt load of a company into account as a part of the capitalization factor. Under this method, Mr. May determined a capitalization factor of 10.5. Mr. May multiplied this factor by the adjusted base-year earnings. He adjusted the result to reflect a control premium, a marketability discount, and the value of nonoperating assets, to yield a value for HII of $ 18,600,000. Mr. May's second alternate method was the market comparable method. Under this method, using data from the five companies that Mr. May had identified as comparable to HII, he determined the ratios that the market value of the companies' stock bore to *659 certain other amounts, such as book values, sales, current earnings, and cash flows. These ratios, refined and applied to HII, indicated a value for the company of $ 15,240,000. Finally, Mr. May utilized an asset liquidation methodology based on appraisals of HII's real estate and equipment. That method indicated a value of $ 17,260,000, assuming an orderly liquidation. Mr. May found that the three alternative methods supported his initial value for HII, as of September 27, 1982, of $ 17,820,000. Having found the value of the firm, Mr. May allocated that value to the HII stock, both before and after the recapitalization. His pre-recapitalization allocation of the firm's value to its outstanding stock was relatively straightforward, for both the voting and nonvoting common stock. Based on his experience and on published studies, Mr. May allocated to decedent's pre-recapitalization common stock a control premium of 37.5 percent, and then applied a discount of 10 percent for lack of marketability. He discounted the minority shares (those held by decedent's sons and by his wife) by 20 percent from their pro rata value to reflect lack of control of the company. Using these factors, *660 Mr. May valued each share held by decedent at $ 1,202.59 and each minority share at $ 763.26. The resulting total value for decedent's pre-recapitalization voting and nonvoting common stock was $ 14,803,300. Valuing the post-recapitalization stock was considerably more complicated. HII's Class A and B preferred stock controlled the corporation and could command dividends, which could be paid at a rate of prime plus 2 percent. However, those dividends were noncumulative and would only be paid if declared by HII's board of directors. Furthermore, the Class A and B preferred stock would lose voting power, and thus control of the corporation, on the later of November 4, 1990, or the death of decedent. To determine the value of the preferred stockholder's right to dividends, Mr. May first analyzed whether HII would be able to pay preferred dividends at the specified rate. Mr. May adjusted HII's past net earnings for inflation and for the high salary and bonuses that decedent had claimed. He also forecasted HII's future earnings based upon industry projections. Mr. May then calculated anticipated dividends payable to the holders of the Class A and Class B preferred stock. He concluded *661 that HII could pay all the dividends that the owner of the preferred stock might demand. Mr. May next used four methods for allocating the firm's value to decedent's Class A and B preferred stock. He relied primarily upon the Black-Scholes Option Pricing method because he felt it was "the most robust indicator of value for the securities". The Black-Scholes method is a means of determining the value of an option to buy common stock at a given price, at a given time. Under this method, Mr. May assumed that HII's preferred stock, which was held by decedent and his wife and which held voting control of the company, functioned as an option to buy the firm. Mr. May assumed that a "willing buyer" of the preferred shares on September 27, 1982, would extract the full amount of available dividends for each year or partial year between the time of acquisition, September 27, 1982, and November 4, 1990 -- the earliest date upon which the preferred's voting rights might lapse. Mr. May further assumed that before November 4, 1990, a willing buyer of HII's stock would liquidate the corporation and take his $ 100 per-share preference. Mr. May surmised that the willing buyer would not hold *662 his stock after November 4, 1990, when its voting control of HII could be terminated suddenly by decedent's death. From his option-pricing calculations, Mr. May determined that the value of decedent's Class A and B preferred stock on September 27, 1982, was $ 15,613,369. Mr. May found support for his option-pricing conclusion by computing the value of the Class A and Class B preferred stock under a discounted cash flow method. Under this method, he ascertained a 1982 value for the cash flow that HII could be expected to generate for its shareholders before November 4, 1990. Mr. May calculated the future cash flow of the company by estimating its future revenues. He then derived a cost of equity figure from the data of other companies whose securities present similar dividend-paying capabilities. He discounted the cash flow of the corporation by that percentage and made further adjustments for debt repayment. Under this method, Mr. May determined a $ 15,620,185 value for decedent's shares. Mr. May's third method involved examining the prices of comparable public stock issues. Mr. May conceded that there were no equities in the market comparable to HII's noncumulative, variable-rate *663 control block of voting preferred stock. Nevertheless, he looked at other issues of publicly traded preferred stock and adjusted their prices to develop a value of $ 15,362,082 for decedent's shares. Finally, Mr. May determined that, upon an orderly liquidation of HII's assets, the holder of decedent's preferred shares would be able to claim $ 16,168,400. Mr. May concluded that the values of the latter three methods tended to confirm the Black-Scholes method. Mr. May ultimately valued decedent's pre-recapitalization shares at $ 14,803,299. He valued decedent's post-recapitalization preferred stock at $ 15,613,369. Petitioners therefore contend that decedent made no gift to the other shareholders in the recapitalization. B. Mr. Hanan's Valuation
Respondent countered Mr. May's expert valuation with the report and testimony of Mr. Martin D. Hanan, president of Business Valuation Services. Mr. Hanan also valued HII as of the date of the recapitalization, and then allocated such value to HII's outstanding stock, immediately before and after the recapitalization. Mr. Hanan arrived at HII's equity value through the use of three methods. His first method was a capital market *664 approach. Mr. Hanan identified a number of comparable companies and examined the financial data of each. He determined the ratio of their stock prices to their book values, to their current earnings, and to their 5-year average earnings. Mr. Hanan then conducted a regression analysis, testing the effectiveness of each of these ratios in predicting the market price of each corporation's stock, relative to the stocks of the other comparable corporations. The test determined that the stock price to book value ratio was the most accurate indicator. Further analysis uncovered two specific factors that were the best predictors of a stock's price to book value ratio: the 5-year average return on equity and the growth in earnings per share for the most recent 12-month period. By inserting HII's data into the model thus constructed, Mr. Hanan determined that the outstanding HII stock was worth 1.055 times book value, or $ 17,104,588, on a minority interest, marketable basis. Based upon the data of other companies, Mr. Hanan determined that the control premium was 35 percent. This yielded a value of $ 23,000,000 for the shareholders' equity. Mr. Hanan's second method was a discounted *665 cash flow determination. He determined HII's anticipated revenues based upon econometric models produced by the Aluminum Co. of America (ALCOA). ALCOA had been studying the truck trailer industry for many years and had published annual forecasts of truck trailer shipments. The nature of HII's business meant that its fortunes could be expected to follow those of the truck trailer industry. Mr. Hanan then determined HII's future expenses by examining HII's actual expenses during its latest business cycle. He determined working capital requirements in the same manner. He made further adjustments for future depreciation, capital expenditures, and taxes to derive an anticipated cash flow. Mr. Hanan completed his cash flow analysis by discounting HII's anticipated cash flow by the corporation's cost of capital. After examining the stock prices of comparable publicly traded companies, he arrived at a cost of capital figure of 16 percent, which he used to discount the anticipated cash flow. This discounting yielded an estimated equity value for HII, after addition of a residual value and other adjustments, of $ 23,400,000. Mr. Hanan's last method was to determine an "asset accumulation" *666 value for HII. In effect, this was the value of HII based upon the net worth of its assets. Mr. Hanan took into account current assets, plus real and personal property, plus intangible assets, including HII's trained work force, which he valued at $ 2,390,000. He calculated that the value of these assets was $ 26,355,000. Mr. Hanan lowered this figure, however, because, in 1982, HII was earning less than the average return on equity. He ultimately determined a value of $ 21,000,000. Mr. Hanan utilized the values derived under each of his three methods in reaching his determination of HII's value. He gave the most emphasis to the amount determined under the capital market approach. He assigned to the discounted cash flow approach and the asset accumulation approach together the same weight as the capital market approach alone. The resulting total value was $ 22,600,000. Mr. Hanan then applied a 10-percent marketability discount to arrive at a value for HII of $ 20,500,000 as of September 27, 1982. Mr. Hanan's figures are summarized as follows: Weighted
Approach
Value
Weight
Value Capital market
$ 23,000,000
50%
$ 11,500,000 Discounted cash flow
23,400,000
25%
5,850,000 Asset accumulation
21,000,000
25%
5,250,000  Total value
22,600,000  Less 10% marketability discount
(2,260,000)  Fair market value (rounded)
20,500,000 *667 Mr. Hanan then allocated this value to decedent's pre-recapitalization stock. After factoring in a 35-percent control premium on decedent's voting common and nonvoting common shares, he arrived at a value of $ 17,029,578 for decedent's control block. Valuing the post-recapitalization Class A and B preferred stock once again presented a more complex problem. Mr. Hanan used two different approaches. The first involved valuing the Class A and B preferred stock under the assumption that the owner would hold the stock for its dividend yield. Mr. Hanan's report indicated that HII's earnings would have been sufficient in only 2 of the previous 5 years to finance the dividend payments required by 1982 prime interest rates. At trial, he was asked to assume that the dividends had been calculated under the prime interest rates prevailing in the actual years in question. His response was that, even assuming the actual lower interest rates, HII's earnings could have covered the dividends in only 3 of the 5 years. Mr. Hanan additionally noted that the Class A and B preferred stock, with its capacity to demand high dividends, represented 85 percent of HII's equity. To Mr. Hanan, the fact *668 that this proportion of the company's ownership could demand the payment of very substantial dividends presented a serious risk of default on the corporation's obligations. His doubts concerning dividend coverage, plus the possibility of default, led Mr. Hanan to conclude that HII's Class A and B preferred were speculative stocks, with respect to which the hypothetical willing buyer would demand a high yield. Mr. Hanan then examined the preferred stock yields of other stock issues that he had identified as "speculative". He determined that HII's Class A and B preferred stock would not attract buyers unless it was priced so that its dividend yield represented a 25-percent annual return on investment. Mr. Hanan calculated that the anticipated prime-plus-two-percent dividends on the Class A and B preferred stock would be worth $ 15.50 per year. Therefore, because this valuation approach required that the annual return equal 25 percent of the stock price, Mr. Hanan calculated that each share of stock was worth $ 62. Mr. Hanan reduced this value further because of the scheduled lapse in the stock's high dividend and voting rights. His final "dividend yield" value was $ 50 per share. *669 Mr. Hanan's second approach was to value the Class A and B preferred stock under the assumption that a buyer of the stock would immediately sell the corporation's assets as a going concern and claim his preference of $ 100 per share from the liquidation proceeds. Mr. Hanan determined that such an asset sale would present both financial and litigation risks. One financial risk was that the value of the company's assets would decline before the liquidation took place. Mr. Hanan determined that the level of dividends payable during the liquidation period would be another factor lowering the stock's value. Mr. Hanan assumed that, during the liquidation process, the dividends would be payable at a 15.5-percent rate, well below the 25-percent rate that he had earlier concluded would be necessary to attract buyers of the preferred stock. This would depress the price paid by the buyer for the stock. Mr. Hanan also noted taxes on the liquidation proceeds as a consideration. Mr. Hanan determined that the total financial risks required a 10-percent discount from the $ 100 per-share liquidation price. Mr. Hanan determined that the other risk in the liquidation scenario arose from the *670 threat of litigation instituted by the common shareholders against the holder of the Class A and B preferred stock. Mr. Hanan assumed that the preferred shareholder would be highly motivated to liquidate the corporation as soon as possible to minimize the financial risks discussed above. He also assumed that such motivation would lead the preferred shareholder to sell the assets for a price that would meet the liquidation preference amount, but would not represent the full value of the assets. The common stockholders' lawsuit would be based upon the allegation that, by liquidating the company, the controlling shareholders violated their fiduciary duty to the holders of the common stock. Mr. Hanan assumed that the chances of the common stockholders' success in litigation was 50 percent. He further estimated that, if successful, their damages would represent 30 percent of the $ 20.5 million liquidation proceeds. He decided that the total liquidation risk would warrant a 15 percent, or $ 3.075 million, discount from the sale proceeds. This represented a 17.3-percent discount on the preferred shares. Mr. Hanan assumed that, under the liquidation scenario, the Class A and B preferred *671 stock could initially command $ 100. He concluded, however, that the $ 100 figure should be discounted separately by 10 percent for financial risks and then by another 15 percent for litigation risks. The stock would thus be worth $ 75 per share. Because this amount exceeded the valuation of the preferred stock under his dividend-yield scenario, Mr. Hanan adopted it as his value of the preferred stock. Using the $ 75 per share figure, he arrived at a value of $ 12,126,300 for the post-recapitalization Class A and B preferred stock. Based upon Mr. Hanan's valuation of decedent's pre-recapitalization common stock at $ 17,029,578 and his valuation of decedent's post-recapitalization Class A and Class B preferred stock at $ 12,126,300, respondent asserts that, as a result of the recapitalization, decedent made a gift to the remaining shareholders of approximately $ 5 million. C. The Value of HII Stock
We must determine, with the help of the expert testimony, whether the shares of common stock that decedent surrendered in the capitalization were more valuable than the shares of preferred stock that he received in exchange. This task requires a determination of value and *672 presents a question of fact. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). "Valuation issues are inherently imprecise and capable of resolution only by a Solomon-like pronouncement." Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987). However, this does not mean that the Court will arbitrarily determine a value between those proffered by the parties. Id. We are not bound by the opinions of the experts but may use them to assist in deciding the relevant values. E.g., Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285. One expert may be persuasive on a particular element of valuation, and another expert may be persuasive on another element. Parker v. Commissioner, 86 T.C. 547, 562 (1986). The first part of our task is valuing the pre-recapitalization shares. After reviewing the evidence presented, we find a value between those offered by petitioners' Mr. May and respondent's Mr. Hanan. Petitioners' expert, Mr. May, found that HII's equity value as of September 27, 1982, *673 was $ 17,820,000. In reaching his conclusion, Mr. May viewed HII's earning potential through a pessimistic lens, by evaluating the company in its 1982 posture -- that is, in the trough of its 5-year business cycle. However, the assumptions regarding HII's financial strength that Mr. May used in valuing decedent's pre-recapitalization common stock contrast with those that he used in determining the post-recapitalization value of decedent's preferred stock. For the latter purpose, he made optimistic estimates of future earnings and dividends. Therefore, his approach tends to stress lower values for the pre-recapitalization common stock and higher values for the post-recapitalization preferred stock. We find Mr. May's pre-recapitalization approach to be too pessimistic. Mr. May's pre-recapitalization value for decedent's stock derives from use of the "unleveraged capitalization" method. Basic to this method is the development of an "unleveraged capitalization factor" that is multiplied by the company's adjusted earnings to ascertain the company's value. Mr. May calculated the unleveraged capitalization factors of five comparable companies whose financial information was a matter *674 of record. Included among these five companies was Fruehauf, Inc., a company whose products, recent earnings trends, and business cycle very closely resembled those of HII. Mr. May determined the average of the five comparable companies' unleveraged capitalization factors to be 12.1. He also calculated the average unleveraged capitalization factor of the comparable companies, excluding Fruehauf, to be 10.24. Mr. May chose to use the average that excluded Fruehauf because Fruehauf had incurred a loss during the 12 months preceding the September 27, 1982, valuation date. Use of 10.24, rather than 12.1, as the capitalization factor reduced the value of HII's equity derived from multiplying the capitalization factor by HII's adjusted earnings. We believe that Mr. May should have incorporated Fruehauf's data in calculating a capitalization factor for HII. Mr. May's own charts reveal a similarity between HII and Fruehauf that is lacking in the other companies. Although HII, Fruehauf, and the others all followed a generally cyclical earnings pattern for the 4 years preceding the valuation date, in the 12-month period before that date, the rate of earnings of HII and Fruehauf dropped *675 well below those of the other companies. Fruehauf, with its depressed earnings, had an unleveraged capitalization factor higher than any of the other comparable companies. HII had similarly depressed earnings. In the case of both Fruehauf and HII, a high capitalization factor was justified by the companies' strong prospects. Both could expect substantial increases in earnings when the regulations implementing the Surface Transportation Act were promulgated, and when, as a result, the market for new and larger trailers opened up. Two of Mr. May's alternative methods for finding HII's pre-recapitalization value suffer from similar infirmities. He used a different capitalization factor to find HII's value under the CAPM method, but he also excluded Fruehauf's data in computing the CAPM capitalization factor. Again, Mr. May understated HII's prospects by deriving a capitalization factor solely from firms whose current earnings performances were superior. Another of Mr. May's alternatives is the "market comparable" method. Under this method Mr. May determined a value for HII based on the ratio of comparable firms' stock prices to other financial indicators, such as those firms' *676 current earnings or cash flows. This method values HII as if it were the average of comparable firms. In doing so the method fails to account for the depressed state of HII's earnings in contrast to those of the other firms. Using an asset liquidation methodology, Mr. May determined that HII's value was $ 17,260,000. Unlike his other methods, the asset liquidation methodology does not force HII into the mold of comparable companies. However, Mr. May's liquidation value does not include the value of a trained work force. Petitioners argue that, in a piecemeal sale of HII's assets, a trained true work force does not add to the value of the assets sold. This may or may not be true depending upon whether potential buyers of the assets would continue to operate the same or a similar business. We think that Mr. May's valuation is too low because it adds nothing for the value of the work force. If Mr. May's pre-recapitalization values are too low, those of respondent's expert Mr. Hanan are too high. Mr. Hanan used a combination of three methods to derive a pre-recapitalization value for HII. There are difficulties with each of the three. He relied primarily upon a capitalization *677 of earnings approach. Under this approach, he valued all of HII's cash as an operating asset. However, he conceded at trial that valuing excess cash as an operating asset would result in an overvaluation of the company. HII had 24 percent of its assets in the form of cash. Mr. Hanan stated that 3 percent in cash would be reasonable for public corporations, such as the comparable corporations. Mr. Hanan also relied upon a discounted cash flow analysis in valuing the company. He admitted, however, that in arriving at a value under this method, he should have deducted some $ 817,000 of short-term debt and other long-term liabilities. In addition, Mr. Hanan computed HII's cost of capital as if its debt component were 25 percent of its capital structure. In reality, debt comprised only 12 percent of HII's capital structure. These errors resulted in an overvaluation of the company. Mr. Hanan's third valuation method was the "asset accumulation approach", which is a form of asset valuation. Under this method, Mr. Hanan included $ 2,390,000 as the value of HII's assembled work force on the theory that a potential buyer would take into account the availability of such a trained *678 work force. However, as mentioned above, the availability of a trained work force may have no value to buyers who do not intend to operate the same or a similar business. Accordingly, in our view, Mr. Hannan's valuation is too high because it includes the full value of a trained work force. In formulating our opinion of the fair market value of decedent's stock in Hutchens Industries, Inc., as of September 27, 1982, we have reviewed the record in this case and have taken into consideration all the factors that would influence the price that a willing buyer would pay to a willing seller for the stock. These factors include: The cyclical nature of HII's business; its position, in 1982, in the "trough" of its business cycle; its potential for sudden and substantial increases in earnings as a result of new statutes and regulations affecting its business; its policy of retaining cash in the corporation rather than paying dividends; the value of the assets owned by HII; the redemption and buy-sell agreements; the degree of control represented by decedent's common stock, and later by his preferred stock; decedent's compensation arrangement; decedent's age at the time of the recapitalization *679 and the sudden nature of his death; the fact that the expert testimony produced relatively close valuations; and the fact that the opinions of each of the experts are questionable in ways that indicate that the actual fair market value lies somewhere between their two opinions. Based upon the foregoing, we find that the fair market value of Hutchens Industries, Inc., as of September 27, 1982, was $ 19,000,000, calculated on a majority interest, nonmarketable basis. The calculation of the value of decedent's pre-recapitalization common shares is relatively straightforward and uncontroversial. Both Messrs. May and Hanan applied a marketability discount of 10 percent and a control premium of approximately 35 percent to decedent's shares. Our overall value of $ 19,000,000 also factors in the marketability discount and control premium. When we allocate the $ 19,000,000 among decedent's shares and those held by the other shareholders, we arrive at a value for decedent's holdings of common stock of approximately $ 16,000,000 ($ 19,000,000 X 12,309.5/14,818 = $ 15,783,540, rounded to $ 16,000,000). The residual value, decreased by the minority discount, would be allocated to the minority *680 shareholders. We must next determine the value of the Class A and B preferred stock that decedent received in exchange for his common stock. A comparison of these two values will reveal whether decedent received less than adequate consideration for the common stock and, thus, made a taxable gift of the difference to the holders of the common stock. The experts have presented us with additional detailed analysis on this question. Mr. May determined that the value of the Class A and B preferred stock was $ 15,613,360, through application of the Black-Scholes option pricing method. However, Mr. May's analysis does not overcome the misgivings we have expressed in the past about use of the Black-Scholes method to value corporate stock. See Snyder v. Commissioner, 93 T.C. 529, 540-542 (1989). In Snyder we noted that the Black-Scholes formula requires a specified time limit before exercise of the option. But here, as in Snyder, there is no way to determine the period the stock will be held, and the values resulting from different holding periods vary widely. Moreover, the computation of volatility is an important variable in the Black-Scholes *681 methodology. However, the HII stock would be untraded and, thus, subject to no market volatility. We recognize that Mr. May's other valuation methods for the HII preferred stock support the value Mr. May derived from the Black-Scholes option pricing method. However, that is a case of the ends -- the valuations derived -- justifying the means used to find them. Before we accept the option pricing formula as a means for valuing corporate stock, its proponents must make a better case for its validity. Mr. May also attempted to value the HII preferred stock by reference to similar securities of publicly traded companies. Yet Mr. May concedes that there are no meaningful comparables for the unique variety of equity presented here: A control block of preferred stock with adjustable-rate, noncumulative dividends, that will lose its control feature on the later of two dates, one being the date of death of the current owner. Mr. May's attempts to value the HII preferred stock by adapting the prices of somewhat similar securities are impressive, but unconvincing. We find more persuasive Mr. May's use of the discounted cash flow method. Using this method, he determined the present value *682 (as of the recapitalization date) for the cash flow that HII would generate between the recapitalization and November 4, 1990. Based on that cash flow, Mr. May determined that the value of decedent's preferred shares was $ 15,620,185. Finally, Mr. May used a liquidation analysis. This analysis is both straightforward and credible. He calculated that the orderly sale and dissolution of HII, after subtracting associated costs and expenses, would enable the corporation to pay the full liquidation preference, $ 16,168,400, for decedent's shares. Respondent's expert, Mr. Hanan, made a more direct allocation of HII's value to the preferred shares. He assumed that the willing buyer would act in one of two ways: He would either hold the stock for dividends, or he would liquidate the company to realize the liquidation preference. Mr. Hanan did not, however, assume that a willing buyer of the stock would act both ways -- that is, that the buyer would collect the dividends, and then, when it seemed expedient, liquidate the corporation. Mr. Hanan concluded that a buyer of HII Class A and B preferred stock would not hold the stock to receive dividends because liquidation of the company *683 s promised a better return. He assumed that the holder would sell the assets as a going concern. Mr. Hanan further assumed that, on such a sale, the preferred stock could command its $ 100 liquidation value. He urged that the willing buyer who planned to liquidate would discount the stock by 10 percent for financial risks. He further decided that the threat of a law suit for violation of fiduciary duty, brought by the common stockholders, would decrease the net receipts from sale of the stock by another 15 percent. Mr. Hanan ultimately valued the stock at $ 12,126,300. In finding the value of the preferred stock as of the recapitalization date, September 27, 1982, we believe that Mr. May has the better argument. Mr. May's analysis suggests post-recapitalization values for decedent's preferred shares of $ 15,621,000 under a discounted cash flow valuation, and $ 16,168,400 under a liquidation method. Mr. Hanan concedes a $ 16,168,400 post-recapitalization value for the preferred stock, based on the liquidation preference of $ 100 per share. However, he ultimately valued decedent's preferred stock at $ 12,126,300 immediately after the recapitalization, on the theory that the *684 value must be discounted for certain financial and litigation risks. We find that the value of decedent's preferred stock as of September 27, 1982, was at least equal to its nondiscounted liquidation preference, $ 16,168,400. In reaching our valuation, we question Mr. Hanan's assumption that a willing buyer of the stock would liquidate the corporation in order to collect the $ 100 per share liquidation preference, without attempting to collect any dividends. However, even assuming that a willing buyer would liquidate the corporation immediately, we find Mr. Hanan's analysis to be flawed. We reject his assumption that certain financial risks would prompt a willing buyer to discount the value of the stock by 10 percent. As mentioned above, the financial risks that Mr. Hanan identified are the possibility that the value of the company's assets would decline before it could be liquidated and the possibility that the dividends payable before liquidation would cause a decrease in the value of the company's stock. However, as we have noted, HII reasonably anticipated a significant increase in earnings as a result of new Federal regulations. Nor do we think, as Mr. Hanan asserts, that *685 the expected receipts on the sale of the preferred stock should be discounted by another 15 percent in anticipation of a successful lawsuit by disgruntled minority shareholders. Mr. Hanan argues that: "The damage claim would be based on the premise that full value [on sale of the corporation's assets] was not received either because it was not bargained for, or because the timing of the sale did not allow full value to be realized." In making this argument, he assumes that: "Since the liquidation preference for all preferred shares totals roughly $ 17.7 million, the preferred stockholder is motivated to sell the company as quickly as possible, to minimize financial risk, for a price that would cover the liquidation preference but would not necessarily represent full value." Thus, in effect, Mr. Hanan's valuation analysis is based on the supposition that a potential buyer will, in all cases, sell the assets of the company in derogation of his responsibilities to the other shareholders of the company in violation of securities laws. We do not believe that this is a valid assumption to make. In the absence of such a violation of securities laws by the potential buyer, Mr. Hanan's *686 analysis falls apart. Missouri law, to which HII is subject, provides that minority shareholders have the right to dissent from certain actions of the majority, including "a sale or exchange of all or substantially all of the property and assets of the corporation". Mo. Ann. Stat. sec. 351.405 (Vernon 1991). Each dissenting shareholder, however, may demand no more than "the fair value of his shares". Id. In this case, "fair value" for the minority shareholders would be the amount remaining after the Class A and B preferred stock claimed its liquidation preference. Because there would be sufficient assets in the corporation to pay "fair value" to the dissenting shareholders, we see no basis for a substantial discount based upon the possible success of a shareholder suit. Because we conclude that Mr. Hanan's discounts are unwarranted in this case, we also conclude that decedent's preferred shares were worth at least $ 16,000,000 on September 27, 1982. Since they are worth no less than the value of the stock that decedent surrendered in the recapitalization, it follows that he made no gift on the recapitalization. There remains the question of Mrs. Hutchens' tax liabilities *687 in the recapitalization. Respondent now appears to concede that Mrs. Hutchens made no gift in the recapitalization, based upon the valuations prepared by Mr. Hanan. However, respondent points out that the valuations made by petitioners' expert, Mr. May, suggest that Mrs. Hutchens' pre-recapitalization common stock was worth $ 312,000 more than the post-recapitalization Class A preferred stock that she received in exchange. Mr. May's results, if accepted, would support a finding that Mrs. Hutchens had made a gift of that amount to the other shareholders. Mr. May's value for the HII Class A preferred stock, however, is dependent upon application of the Black-Scholes option pricing method, which we decline to accept in valuing the Class A preferred stock. The remaining evidence in the record indicates that Mrs. Hutchens received stock of at least equivalent value in the recapitalization and, therefore, that she made no gift. We so hold. Issue 2. The Foregone Dividend Issue
The second issue for decision is whether decedent and his wife made taxable gifts by reason of their failure to cause annual dividends to be declared on the Class A and Class B preferred stock that they *688 received in the recapitalization. Petitioners bear the burden of disproving respondent's gift tax liability determinations for 1983, 1984, and 1985, as set out in the notices at issue in the cases at docket Nos. 12081-90 and 12275-90. By answers in the cases at docket Nos. 12081-90 and 12275-90, and by amended answer in the case at docket No. 1455-89, respondent claims increased gift and estate taxes based upon alleged foregone dividends during the 1983, 1984, and 1985 calendar years. In addition, by amended answers in the cases at docket Nos. 1455-89 and 1454-89, respondent asserted gift tax for the first time on alleged foregone dividends for the 1982 calendar year. Respondent bears the burden of proof on these increases and on this new matter. Rule 142(a). Respondent points out that decedent held voting control of HII and that he and his wife occupied two of the three positions on HII's board of directors during the years in question. Respondent argues that by failing to declare dividends on the Class A and B preferred stock, decedent and his wife "transferred value to the common shareholders," their sons, "whose interest in the residual value of the equity as well as future *689 prospects would be enhanced". Respondent argues that, in this case, decedent and his wife valued their preferred stock on the basis of a large "purported dividend" payable each year, which had the effect of increasing the value of their stock and of decreasing any gift that might have been made in the 1982 recapitalization. According to respondent, "to reduce the value of a gift in 1982 because of a purportedly large dividend and then to ignore the economic consequences of the failure to pay that dividend clearly would permit the avoidance of tax on an inter-generational transfer of wealth". In support of this argument, respondent cites Dickman v. Commissioner, 465 U.S. 330 (1984). In that case, the Supreme Court held that the taxpayers, a husband and wife, made taxable gifts to their son by allowing their interest-free demand loan to him to remain outstanding. Respondent contends that the failure in the present case to declare dividends on the HII preferred stock is sufficiently similar to the interest free demand loan at issue in Dickman that decedent and his wife are subject to gift tax on the potential dividends that were not declared. *690 We rejected that premise in Snyder v. Commissioner, 93 T.C. 529, 546-547 (1989). In that case, we explained why the Dickman rationale does not apply to preferred stock as follows: In asking us to apply Dickman to this case, respondent reads Dickman so broadly as to blur the distinction between debt and equity. Although preferred stock manifests some of the characteristics of debt, we cannot say that those characteristics are so close as to warrant the application of Dickman. A creditor lends money to a debtor to use without surrendering ownership of the money. Specifically, the lender retains the right to reclaim the money together with a sum paid for its use. That is why the value of an "interest free" loan does not depend on what use the borrower makes of the loan proceeds but on what it would have cost the borrower to obtain the funds in the marketplace. Cohen v. Commissioner, 92 T.C. 1039 (1989). A borrower must pay to use the money lent. On the other hand, an equity interest in a corporation ordinarily gives no certain right to be paid for use of the capital contributed in exchange for the *691 interest. While an equity interest in a corporation may have a right to require the repayment of the contributed capital, the corporation that issued the stock does not have to pay for the use of the property contributed. If payment is made (i.e., dividends), it is discretionary with the corporation's board of directors. * * * [Id. at 546.]
Respondent points out that in Snyder we found that decedent had made a gift by failing to convert her Class A preferred stock, which was entitled to annual, non-cumulative, 7-percent dividends, into Class B preferred stock on which dividends would have been cumulative. This failure, we held, constituted a continuing gift to the common shareholders to the extent that dividends would have accumulated on the Class B preferred stock and would have been payable by the corporation. Id. at 547-548. In that situation, decedent's right to convert her noncumulative preferred into cumulative preferred was absolute and was not subject to the discretion of the corporation's board of directors. In this case, however, action by the board of directors was necessary before any dividends existed that could be the subject of a gift. Respondent *692 points out that decedent and his wife were the majority shareholders of HII and two of its three directors. Thus, respondent argues, they could have declared dividends whenever they wished, and their failure to do so must be deemed a gift to their sons. However, respondent's argument overlooks the general principle that: "A majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests. Moreover, the directors also have a fiduciary duty to promote the interests of the corporation." United States v. Byrum, 408 U.S. 125, 137-138 (1972). (Fn. refs. omitted.) Under Missouri law: "An officer or director of a corporation is compelled by his fiduciary duty to exercise good faith and subordinate his own selfish interests to those of the corporation where they conflict." Fitch v. J.A. Tobin Construction Co., 829 S.W.2d 497, 504 (Mo. Ct. App. 1992). (Citations omitted.) The decision whether to retain cash in a corporation or to declare dividends financed with that cash can be vital to the health of a corporation. The power to make that choice is vested *693 in the directors of the corporation. In this case, the HII board had valid reasons for not declaring dividends. In 1982, it was becoming clear that the Hutchline coal-sorting product line was a commercial failure that also would cost the company a considerable sum in product liability damages. In 1983, revenue remained relatively flat, and in 1984, HII faced liabilities for failures in its van sliders, as well as new competition in the van slider business. Therefore, although business started an upswing in 1984, decedent advised the board that the corporation should retain a "large working capital reserve for the purpose of financing receivables and inventory" that HII would need to meet new product demands. In early 1985, decedent's death forced the company into new leadership under his 34-year-old son, whose management decisions caused uneasiness among the other shareholders. On balance, we think that these factors, as further discussed above, demonstrate an adequate basis for the company to keep cash in the corporation, rather than declaring dividends. Moreover, after a few years, declaration of dividends on the preferred stock may have required substantial borrowing by *694 the company. Given the company's history, we accept the board's decision to keep HII's money in the corporation. Our determination that the undeclared dividends were not gifts obviates the need to address respondent's contention that such gifts were of future interests for gift tax purposes. Issue 3. The Retained Life Estate Issue
In general, a decedent's gross estate includes not only the value of all property in which the decedent has an interest at the time of his or her death, section 2031, but also the value of certain property that is not owned by the decedent at the time of death under local property law. Included in the latter category are: Property that a decedent transferred for less than adequate and full consideration if the decedent held an interest in the property within 3 years of death, section 2035; property of which a decedent retained beneficial enjoyment during his or her life, section 2036; property that was nominally transferred during a decedent's lifetime but transfer of which is effectuated at the date of death, section 2037; and property over which a decedent retained the power to alter, amend, revoke, or terminate a previous lifetime transfer, *695 section 2038. The notice of deficiency issued in the case at docket No. 1455-89 determined that the recapitalization was a transfer for less than adequate and full consideration and that decedent's gross estate should include the value of an 83-percent interest in HII, pursuant to sections 2035, 2036, 2037, and 2038. Respondent also determined, in the alternative, that decedent had retained a beneficial interest in 83 percent of HII, which is includable in gross income under section 2033. At various points during these proceedings, including the Government's reply brief, respondent conceded the inapplicability of sections 2033, 2035, 2037, and 2038. Therefore, we are only called upon to decide whether decedent retained a life estate in the value of 83 percent of HII so that his gross estate must include the value of that interest under section 2036. Petitioners bear the burden of proof on this issue. Rule 142(a). As in effect on the date of decedent's death, section 2036, in pertinent part, provided as follows: (a) GENERAL RULE -- The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any *696 time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death -- (1) the possession or enjoyment of, or the right to the income from the property * * *
(b) VOTING RIGHTS -- (1) In general. For purposes of subsection (a)(1), the retention of the right to vote (directly or indirectly) shares of stock of a controlled corporation shall be considered to be a retention of the enjoyment of transferred property. (2) Controlled corporation. For purposes of paragraph (1), a corporation shall be treated as a controlled corporation if, at any time after the transfer of the property and during the 3-year period ending on the date of the decedent's death, the decedent owned (with the application of section 318), or had the right (either alone or in conjunction with any person) to vote stock possessing at least 20 percent of the total combined voting power of all classes of stock.
In the Government's posttrial brief, respondent *697 points out that decedent held 86.8 percent of the voting control of the corporation prior to the recapitalization and 86.3 percent after the recapitalization. Therefore, respondent reasons, decedent retained a life estate in 86.3 percent of the voting power of the corporation and, under section 2036(b), the value of that voting control is includable in decedent's estate under section 2036. Respondent values that voting control as equal to the value of 83 percent of HII. The Government's opening brief explains that: "Respondent uses 83% as the amount includable in the decedent's gross estate because the 86.3% voting control gave the decedent an 83% interest of the equity in Hutchens Industries, Inc. before the recapitalization." Respondent later adjusted both the 86.3-percent control figure and the 83-percent equity figure to account for the 4,390 shares of Class A preferred stock that decedent donated to charity. Because these gifts reduced decedent's voting control over the corporation by .3 percent, respondent now argues that 82.7 percent of the date of death value of the corporation is includable in decedent's gross estate. Respondent argues that the date of death value of *698 HII is $ 40 million and, thus, that 82.7 percent of that figure, or $ 33,080,000, is includable in decedent's gross estate. Respondent argues that the same result follows if the recapitalization is characterized as a transfer of voting rights by decedent to his son Jeffrey, taking place at the later of decedent's death or November 4, 1990. Respondent essentially argues that when decedent's preferred stock lost its voting rights on November 4, 1990, decedent transferred control of HII to his son. Therefore, the Government asserts that under 2036(a)(1), "Lewis G. Hutchens' estate includes the fair market value of the [post-recapitalization] common stock owned by Jeffrey C. Hutchens to the extent of the value of Jeffrey C. Hutchens' stock arising from the transfer of voting power to such stock on November 4, 1990." A. Section 2036(a)
Section 2036(a)(1) provides that a decedent's gross estate includes the value of an interest in property that a decedent has transferred, if "he has retained * * * the possession or enjoyment of, or the right to the income from" that property. Here, respondent's theory is that when decedent transferred his common stock in the recapitalization, *699 he retained an interest in 86.3 percent of the voting control of HII and in 83 percent of its income. By its terms, however, section 2036 does not apply when decedent has received "adequate and full consideration" for the property transferred. Sec. 2036(a). As set out above, we find that decedent received adequate consideration for the pre-recapitalization common stock that he transferred. It was worth $ 16 million, and he received $ 16 million in new Class A and B preferred stock in the recapitalization. Accordingly, by its terms, section 2036(a) does not apply in this case. Moreover, section 2036(a) applies only if the decedent retained an interest in the property that he transferred. In this case, decedent transferred common stock to HII in the recapitalization, and he did not retain an interest in that stock. Instead, HII canceled the old stock and issued new preferred stock to him. Missouri law, to which HII is subject, requires each class of stock to be separately identified in the company's articles of incorporation. Mo. Stat. Ann. sec. 351.055(3) (West 1991). The right to dividends is available to the owner of each specified class of stock, but only to the extent *700 that the corporation's board declares such dividends. Mo. Stat. Ann. sec. 351.220 (West 1991). In this case, to facilitate the recapitalization, HII's articles of incorporation were amended to create new classes of stock, including the Class A and Class B preferred stock. The new stock differed from the old common stock. The new classes of stock had different dividend and liquidation preferences, and they differed in the duration of the voting power provided to their owners. When he died, decedent's only holdings were in the new stock. He no longer had an interest in the old stock. Accordingly, under section 2036(a), decedent retained no interest in the property transferred, and decedent's estate includes no portion of the transferred property. See Boykin v. Commissioner, T.C. Memo. 1987-134 (applying similar provisions of Georgia law to find no inclusion under section 2036(a) when decedent retained no interest in the class of stock transferred). Respondent urges upon us the holding in Estate of Cooper v. Commissioner, 74 T.C. 1373 (1980). In Cooper, a decedent transferred some bonds into trust for her grandchildren, *701 but she retained the severable interest coupons from those bonds. There we held that, under section 2036(a), the value of the bonds was required to be included in her estate. Id. at 1376. We find Cooper to be inapposite. In that case the decedent retained the income portion of the very property that she had transferred into trust. Here, decedent retained no interest in the stock surrendered in the recapitalization. Instead, his post-recapitalization control and dividend rights came from new and different forms of preferred stock. B. Section 2036(b)
Respondent argues, in the alternative, that, if the value of the transferred interest is not included in decedent's estate under section 2036(a), then it is included under section 2036(b). Section 2036(b) addresses the transfer of stock in a controlled corporation. It provides that the transferor's direct or indirect retention of voting rights in the corporation is considered to be a retention of the enjoyment of the transferred property. Again, the fact that decedent received full and adequate consideration for his old voting common stock means that section 2036(b) does not apply. Sec. *702 2036(a). Moreover, the legislative history accompanying section 2036(b) makes clear that Congress did not intend the provision to apply to stock in a controlled corporation where decedent could not vote the transferred stock: The rule [of section 2036(b)(1)] would not apply to the transfer of stock in a controlled corporation where the decedent could not vote the transferred stock. For example, where a decedent transfers stock in a controlled corporation to his son and does not have the power to vote the stock any time during the 3-year period before his death, the rule does not apply even where the decedent owned, or could vote, a majority of the stock. Similarly, where the decedent owned both voting and nonvoting stock and transferred the nonvoting stock to another person, the rule does not apply to the nonvoting stock simply because of the decedent's ownership of the voting stock. [S. Rept. 95-745, at 91 (1978).]
We note that in 1981, respondent issued a revenue ruling that cites the above language and states: "The legislative history of section 2036(b) demonstrates that the rule of that section will not apply to the transfer of stock in a controlled corporation where *703 the decedent could not vote the transferred stock." Rev. Rul. 81-15, 1981-1 C.B. 457, 458. In this case, decedent could not vote the transferred stock. He had surrendered the old common stock to the corporation, and it had been canceled. He retained only the new preferred stock that had been issued in the recapitalization. Therefore, notwithstanding his retention of voting control of HII, in light of the committee report quoted above, we hold that section 2036(b) does not apply to include any interest in HII in decedent's estate. Respondent argues, in the alternative, that if 83 percent of the value of HII is not included in the gross estate, then, under section 2036(b), we must find that decedent's gross estate included the value of Jeffrey's voting common stock. Respondent argues that decedent retained voting control of HII until the later of decedent's death or Jeffrey's fortieth birthday. Thus, respondent continues, decedent held an interest in Jeffrey's voting common stock, if only by rendering it powerless. This contention again fails to recognize that section 2036 reaches only retained interests in property transferred by decedent. *704 Decedent never had any interest in the stock issued to Jeffrey. There was no agreement that Jeffrey would vote his new common stock as decedent directed. At the time of his death, decedent's only interest was in the Class A and B preferred stock that he had received in the recapitalization. Issue 4. The Date of Death Value of Decedent's Interest in HII
At issue is the value of decedent's interest in HII at the time of his death. Schedule B of decedent's estate tax return reports the total value of his 157,294 shares of HII Class A and Class B preferred stock on the date of his death to be $ 11,451,003.20, or $ 72.80 per share. In the notice of deficiency in the case at docket No. 1455-89, respondent determined that the total value of decedent's Class A and B preferred stock on his date of death was $ 14,675. In an amendment to the answer filed in the case at docket No. 1455-89, respondent alleges that the aggregate fair market value of decedent's Class A and Class B preferred stock was $ 14,942,930, or $ 95 per share. Therefore, respondent argues that decedent's gross estate includes an additional $ 3,491,926.80, the difference between respondent's more recent valuation *705 and the value reported on the estate tax return. Respondent bears the burden of proof on this issue. Rule 142(a). The resolution of this issue may affect three other issues in these cases. First, decedent's preferred stock in HII was distributed to the Non-Marital Trust pursuant to the terms of decedent's will. If we find that the assets held by the Non-Marital Trust are eligible for the marital deduction under section 2056, a contention rejected by respondent, then the date of death value of decedent's preferred stock in HII will have a bearing on the amount of the marital deduction allowed under section 2056. Second, the fair market value of decedent's stock in HII at the date of death will establish the basis of that stock in the hands of the Non-Marital Trust. Sec. 1014(a)(1). The trust's basis in the stock will largely determine whether the trust realized capital gain on December 12, 1985, when the corporation redeemed the preferred stock held by the trust. Third, the date of death value of decedent's stock in HII is an indication of the value of Mrs. Hutchens' HII Class A preferred stock on the date of death and on December 12, 1985, the date that the corporation redeemed *706 her stock. Accordingly, the date of death value of decedent's stock will be a factor in determining whether Mrs. Hutchens made a taxable gift to her son Jeffrey, the sole remaining shareholder of HII, on the redemption of her shares by HII. In valuing unlisted stock, actual arm's-length sales of the stock in the normal course of business within a reasonable time before or after the valuation date offer the best indication of its value. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Industries Inc. v. Commissioner, 73 T.C. 266, 276 (1979). The regulations offer the following guidance regarding what transfers are considered to have been made "in the ordinary course of business": a sale, exchange or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length and free of donative intent), will be considered as made for an adequate and full consideration in money or money's worth. * * * [Sec. 25.2512-8, Gift Tax Regs.]
The fact that the parties to the transaction are related does not disqualify the transaction from meeting the ordinary *707 course of business standard, so long as they "[act], in our opinion, as one would act in the settlement of differences with a stranger." Beveridge v. Commissioner, 10 T.C. 915, 918 (1948); see also King v. United States, 545 F.2d 700, 705 (10th Cir. 1976) (holding that no gift was made upon sale of stock by a taxpayer to trusts set up for benefit of his children); Estate of Friedman v. Commissioner, 40 T.C. 714, 719-720 (1963) (holding that no gift was made upon payment to stepchildren in settlement of dispute). In this case, there is every indication that the stock redemption, which occurred approximately 9 months after decedent's date of death, was an arm's-length transaction. Despite the familial relationship among many of the parties to the sale, their interests were clearly divergent. Jeffrey, both as president of HII and as its eventual sole remaining shareholder, was motivated to redeem the shares for a low price, and thus, to retain value within HII. Mrs. Hutchens and her other sons wished to maximize their profit by driving up the price of the stock. Further, the independent *708 trustees of the Non-Marital Trust operated under a fiduciary duty to the beneficiaries to attain the highest possible price for the shares. In addition, shortly after decedent's death, a rift had developed between Jeffrey, who controlled the daily operations of HII, and his brothers, who were the remaindermen of the Non-Marital Trust. Jeffrey's brothers were critical of his management of HII, and relations between Jeffrey and his brothers eventually became hostile. Over the course of several difficult months, the parties negotiated the redemption of the trust's preferred stock in HII for a cash payment of $ 11,451,003.20 and Jeffrey's resignation as a trustee. Each of the beneficiaries of the trust -- Mrs. Hutchens, Gene, Ted, and Todd -- was represented by separate counsel, and the court appointed a guardian ad litem to represent the interests of all minor and unborn beneficiaries. We believe that the sale was consummated at arm's-length and that the $ 72.80 price reported by the estate was the fair market value of the stock on the date of the redemption. Respondent has conceded that "there is no evidence of any change of value between March 1, 1985 [the date of death], and *709 the transfer of stock to Hutchens Industries, Inc. in December of 1985." Under these circumstances, we find that $ 72.80 was the fair market value of the HII Class A and Class B preferred stock on decedent's date of death. Issue 5. The Redemption-Gift Issue
Respondent also alleges that Mrs. Hutchens made taxable gifts upon HII's December 1985 redemption of her stock and of the stock held by the Non-Marital trust at the price of $ 72.80 per share. Respondent urges that the stock was worth $ 95 per share, and, because the redemption price was less than the stock's fair market value, Mrs. Hutchens made gifts of the difference to her son Jeffrey, the sole remaining shareholder of HII. Petitioners bear the burden of proof on this issue. Rule 142(a). Section 2501 imposes a tax "on the transfer of property by gift * * * by any individual". This tax applies "whether the gift is direct or indirect". Sec. 2511(a). Section 2512 provides that: Where property is transferred for less than an adequate and full consideration * * * then, the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift * * *.
If Mrs. Hutchens, directly, *710 through the redemption of her stock, or indirectly, through the redemption of the shares owned by the Non-Marital Trust, received less in compensation than she gave up in the redemption, she may be deemed to have made a gift of the difference. On the record, however, there is no basis to conclude that HII paid less than fair market value for the shares it redeemed from either Mrs. Hutchens or from the trust. We found above that the date of death value of the stock held by the Non-Marital Trust was $ 72.80, the price for which the stock was redeemed in the December 1985 arm's-length transaction. Mrs. Hutchens received $ 72.80 per share when she sold her shares back to HII as part of the same arm's-length sale. Certainly, Mrs. Hutchens' minority shares were worth no more than the majority block held by the trust. Therefore, it follows that she made no gift to HII or to her son by selling her own stock at the same price. Respondent here renews the argument that Mrs. Hutchens made gifts to her son Jeffrey when she did not take dividends on her preferred stock, this time during the period in 1985 after her husband had died and before HII redeemed her shares. To the contrary, however, *711 as noted above, she could make no gift of dividends that were never declared. Additionally, she was a minority shareholder and did not control HII. Respondent does not argue that Mrs. Hutchens was entitled to the $ 3 cumulative dividend on December 12, 1985, the date she sold her shares to the corporation. Indeed, under the Amended Articles, the $ 3 cumulative dividend did not began to accumulate until November 4, 1985. Issue 6. The Income Tax Issue
Respondent has urged, in the alternative, that the Non-Marital Trust earned unreported income in December 1985, when it sold the Class A and Class B preferred stock to HII for $ 72.80. Respondent concedes that the trust could have earned such income on the sale only if we determine that the trust's basis in the Class A and B preferred stock was less than the $ 72.80 price for which it was sold. Respondent's own expert, Mr. Hanan, maintains that the basis of the stock in the hands of the Non-Marital Trust was $ 95. We have above determined that the fair market value of the preferred stock on the redemption date was $ 72.80. Therefore, we find that the trust realized no gain when it disposed of the Class A and B preferred *712 stock. Issue 7. Principles of Symmetry
Respondent urges the Court to apply principles of "symmetry" in order to impose taxes on the transfers at issue in these cases. In essence, respondent objects to perceived inconsistencies in the positions taken by petitioners. For example, respondent notes that, in arguing that decedent made no taxable gift in connection with the recapitalization, petitioners rely upon the high dividends payable to holders of the Class A and B preferred stock. Respondent complains that petitioners then argue that decedent did not make taxable transfers in the amount of those dividends to his sons, HII's common stockholders, by decedent's failure to collect those high dividends. For the reasons discussed above, our view is that respondent's determinations are not correct under the statutory framework as it existed during the years at issue. We cannot impose tax based upon respondent's invocation of a vague notion of "symmetry". Respondent's concerns have been addressed for later years in subsequent legislation. For the years at issue, we must apply the law as written. Donigan v. Commissioner, 68 T.C. 632, 636 (1977). *713 Issue 8. The Marital Deduction Issue
Respondent has also determined a deficiency in decedent's estate tax based on disallowance of part of the marital deduction claimed. Petitioners bear the burden of proof on this issue. Rule 142(a). Section 2051 defines the value of the taxable estate as the amount of the gross estate less deductions. Under section 2056(a), an estate may claim, as a marital deduction, the value of property passing to the surviving spouse. Ordinarily, however, the marital deduction does not include the value of property given to the surviving spouse if the interest that passes to the spouse is a life estate or other terminable interest. Sec. 2056(b)(1). Notwithstanding this general disqualification of life estates, section 2056(b)(7) allows a marital deduction in the case of "qualified terminable interest property" or "QTIP" interests. A QTIP interest is property that passes from a decedent to the surviving spouse in which the spouse has a "qualifying income interest for life". Sec. 2056(b)(7)(B)(i). To qualify, the spouse must be entitled to "all the income from the property, payable annually or at more frequent intervals", and no one else must *714 be able to appoint any part of the property to anyone but her during her life. Sec. 2056(b)(7)(B)(ii). A. The Non-Marital Trust
Respondent makes two contentions concerning the Non-Marital Trust. First, as discussed above, respondent asserts that decedent's gross estate includes, under section 2036, a retained interest in decedent's pre-recapitalization HII common stock. Respondent here argues that this putative retained interest never passed to decedent's spouse and, thus, is ineligible for the marital deduction under section 2056. Our earlier finding that decedent retained no interest in his pre-recapitalization stock obviates the need to address this argument further. Second, the Government's opening brief argues that the value of the preferred stock held by the Non-Marital Trust may be higher for purposes of inclusion in decedent's gross estate under section 2031 than for purposes of deduction as a QTIP interest under section 2056. This difference in value would increase decedent's taxable estate. However, because respondent's reply brief concedes that the value of the Class A and B preferred stock is the same for both section 2031 and section 2056 purposes, we *715 need not pursue the matter further. B. The Life Insurance Trust
Respondent contends that the L.G. Hutchens Insurance Trust is not QTIP property and does not qualify for the marital deduction because of certain administrative powers granted to the trustee. Respondent argues that: The powers of the trustee * * * evidence an intention to deprive the spouse of rights as a sole income beneficiary. * * * The trust expressly grants to the trustee powers well beyond those normally allowable under most state statutes, e.g., the ability to invest in atypical trust securities or property and the right to make unsecured loans to decedent's estate or to buy non-income producing assets from the estate. These express powers reduce the spouse's interest in such a manner that she is effectively not entitled to the income for life.
The regulations address the effect of administrative powers on the disqualification of trusts from QTIP status as follows: Provisions granting administrative powers to the trustee will not have the effect of disqualifying an interest passing in trust unless the grant of the powers evidences the intention to deprive the surviving spouse of the beneficial *716 enjoyment required by the statute. Such an intention will not be considered to exist if the entire terms of the instrument are such that the local courts will impose reasonable limitations upon the exercise of the powers. * * * [Sec. 20.2056(b)-5(f)(4), Estate Tax Regs.]
In the Government's brief, respondent concedes that Missouri courts will generally review trustee actions using the "prudent man" standard. See Mo. Ann. Stat. sec. 456.500 et seq. (Vernon 1991). However, respondent points out that under Missouri law, "The trustee has all powers conferred upon him by provisions of sections 456.500 to 456.600, unless limited by the trust instrument." Mo. Ann. Stat. sec. 456.510 (Vernon 1991). Respondent asserts that because of the explicit grant of the powers described above in the trust instrument, the general standard of review is inapplicable, and therefore, the trust does not qualify for the marital deduction. We disagree with respondent's conclusion. The trust at issue provides that "any net income * * * be paid to [Mrs. Hutchens] in quarterly or other convenient installments at least annually for so long as the Trust continues." Our reading of Missouri trust law leads *717 us to the conclusion that, notwithstanding the powers given to the trustee in the trust instrument, "the local courts will impose reasonable limitations upon the exercise of the powers" of the trustee, to protect the interest of Mrs. Hutchens. Therefore, the trust provisions evince no intent to deprive decedent's widow of beneficial enjoyment of the income from the trust assets. Missouri law stresses the primacy of a trustee's duty to act in the best interests of the beneficiary. The Missouri Supreme Court has stated that: a trustee is in a fiduciary relation to the beneficiary and "is under the duty to the beneficiary to administer the trust solely in the interest of the beneficiary." (Emphasis ours.) Restatement of Trusts, Sec. 170. This is the primary duty of any trustee and must be the principal guide to be considered in the construction of any powers given him by the trust instrument and propriety of his acts under them. * * * [Vest v. Bialson, 293 S.W.2d 369, 380 (Mo. 1956).] One basic duty of the trustee toward the beneficiaries is "to use reasonable care and skill to make the trust property productive." Tyler v. Citizens Home Bank, 670 S.W.2d 954, 956 (Mo. Ct. App. 1984) *718 (citations omitted); Witmer v. Blair, 588 S.W.2d 222, 224 (Mo. Ct. App. 1979). There is ample authority that, in enforcing the basic fiduciary duties of trustees toward trust beneficiaries, Missouri's courts place reasonable limitations upon the exercise of fiduciary powers granted in the trust instrument. In Vest v. Bialson, supra, a case that directly answers one of respondent's objections to the trust language, the Supreme Court of Missouri reviewed a trust instrument that granted the trustee the power to choose investments "without his being restricted to a class of investments which a Trustee is or may hereafter be permitted by law to make". Id. at 373. In upholding a surcharge on the trustee for losses resulting from an imprudent investment, the court stated that: While we construe the trust provisions as giving * * * [the trustee] sole and complete discretion as to class of investments, nevertheless, this did not authorize speculative or hazardous investments in any class or dispense with all requirements of care, skill, caution and reasonable diversification of risk. * *719 * * [Id. at 380.]
Respondent argues that the court's reasoning in Vest does not apply here, because "the trustee had express power to hold non-income producing assets." However, respondent cites no authority for this conclusion. Moreover, contrary to the thrust of respondent's argument, it is clear that Missouri courts do scrutinize the actions of trustees and other fiduciaries even where such acts have been specifically authorized. See, e.g., Estate of Luyties v. Scudder, 432 S.W.2d 210, 215 (Mo. 1968) (holding that where executor-beneficiary of estate chose among three bequests that he was eligible to receive under the will, he violated fiduciary duty to other beneficiaries by choosing the benefit that maximized his gain at cost to others); American Cancer Society v. Hammerstein, 631 S.W.2d 858, 863-865 (Mo. Ct. App. 1981) (scrutinizing trustee's decision to terminate trust where trust instrument granted trustee sole discretion to terminate same). In light of the general authority that Missouri courts exercise over the actions of fiduciaries, we conclude that the State law imposes *720 reasonable limitations upon the exercise of administrative powers granted to the trustee. See Estate of Smith v. Commissioner, T.C. Memo. 1978-175 (finding that Tennessee law imposed reasonable limitations on trustee actions where trustee had discretion to hold unproductive property, although the applicable standard of review of trustee's action was less stringent than "prudent man" rule). Therefore, we hold that the proceeds of the insurance trust qualify for an estate tax marital deduction. Issue 9. Additions to Tax
Because we have decided that petitioners owe no additional taxes as a result of the transactions at issue, they were not required to file returns reporting any additional taxes. It follows that there is no basis for the imposition of additions to tax for failure to file such returns. In view of the foregoing, Decisions will be entered for petitioners. Footnotes
1. Cases of the following petitioners are consolidated herewith for trial, briefing, and opinion: Estate of Lewis G. Hutchens, Deceased, Jeffrey C. Hutchens, Personal Representative, and Harriett K. Hutchens, docket No. 1454-89; Estate of Lewis G. Hutchens, Deceased, Jeffrey C. Hutchens, Personal Representative, 1455-89, 12081-90; and, Harriett K. Hutchens, docket No. 12275-90.↩